558 S.E.2d 620

**In re EDWARD B., John David F., David Dewane F., George Franklin F., and Benny Jay J.**

No. 28732.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 18, 2001.

Decided Nov. 8, 2001.

Lisa Davis Clark, Gibson, Lefler & Associates, Princeton, for the Appellant, Patricia J.

Ronald Keith Flinchum, Guardian Ad Litem, Welch, for the Children, Edward B., John David F., David Dewane F., George Franklin F., and Benny Jay J.

Sidney H. Bell, Prosecuting Attorney, Welch, for the West Virginia Department of Health and Human Resources.

Gloria M. Stephens, Welch, for Edward B., Sr.

Ronald D. Hassan, Welch, for David D. F.

Kevin A. Wade, Welch, for Charles C.

ALBRIGHT, Justice.

■ This is an appeal by Patricia J.[1] (hereinafter "Appellant" or "mother") from an order of the Circuit Court of McDowell County terminating the Appellant's parental rights to her son Benny J., transferring exclusive legal and physical custody of three other children to their father, and transferring legal and physical custody of a fifth child to the Department of Health and Human Resources (hereinafter "DHHR"). The Appellant contends, *inter alia*, that the lower court erred by failing to make specific findings of fact required by West Virginia Code §§ 49–6–5(a)(5) and 49–6–5(a)(6) (1998) (Repl.Vol.2001) when transferring custody or terminating parental rights as a result of a finding of abuse or neglect.[2] Based upon our review of the record and the arguments of counsel, we reverse the decision of the lower court and remand this matter for further proceedings consistent with this opinion.

## I. Facts

### A. Activities Pre–Dating the Neglect Petition

Although the record regarding DHHR action prior to the filing of the neglect petition is scant, it appears that DHHR began working with the Appellant in 1997, attempting to assist her with allegedly inadequate housing conditions at her mobile home near Panther, West Virginia.[3] The DHHR represented to the court below that it had attempted to

1. We follow our traditional practice in child abuse and neglect matters, as well as other cases involving sensitive facts, and do not use the last names of the parties. *See, e.g., In re Scottie D.*, 185 W.Va. 191, 192 n. 1, 406 S.E.2d 214, 215 n. 1 (1991); *State ex rel. Div. of Human Servs. by Mary C.M. v. Benjamin P.B.*, 183 W.Va. 220, 222 n. 1, 395 S.E.2d 220, 222 n. 1 (1990).

2. The Appellant raised certain assignments of error in her September 12, 2000, petition for appeal that were not raised in her brief after this Court granted the petition for appeal. The petition for appeal raised five assignments of error, as follows: lack of clear and convincing evidence of neglect; hearsay testimony of child protective services worker John Propst; improper denial of improvement period; refusal to comply with recommendations of DHHR reunification plan; and failure to comply with West Virginia Code § 49–6–5(a)(6) by stating facts supporting the court's finding that there was no reasonable likelihood that conditions of neglect could be substantially corrected in the near future. After the petition was granted on November 30, 2000, and substitute counsel for the Appellant had been appointed, the assignments of error were consolidated, restated, or abandoned, leaving only two issues remaining, as follows: failure of the lower court to grant a post-adjudicatory improvement period and insufficient evidence to warrant termination of parental rights.

Because the errors, as assigned in the Appellant's petition for appeal, were neither assigned nor argued in the Appellant's brief, they are hereby waived. *See Britner v. Medical Sec. Card, Inc.*, 200 W.Va. 352, 354 n. 5, 489 S.E.2d 734, 736 n. 5 (1997) ("The defendants' petition for appeal cited as error the circuit court's application of the five year statute of limitations to this case. However, the defendants did not address that issue in their brief and therefore have abandoned that assignment of error"); *State v. LaRock*, 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996) ("Although we liberally construe briefs in determining issues presented for review, issues which are not raised ... are not considered on appeal"); Syl. Pt. 6, *Addair v. Bryant*, 168 W.Va. 306, 284 S.E.2d 374 (1981) ("Assignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived").

3. During portions of the period in which DHHR provided assistance, a boyfriend and five of the Appellant's children resided with her in the mobile home. The children involved in this appeal include Edward Floyd B., Jr. (born 5–30–86), John David F. (born 3–15–91), David Dewane F. (born 9–23–93), George Franklin F. (born 4–16–96), and Benny Jay J. (born 12–27–99). A sixth child, Allison J.F. (born 5–1–89), resided with her father and was not the subject of the underlying matter.

coordinate transportation to medical appointments for the Appellant and her children and arranged family counseling, individual counseling, and homemaking, infant care and parenting skills training through the Children's Home Society and Tug River Health. The record contains nothing beyond the bare representations of the child protective services worker regarding these third-party efforts and does not contain the testimony of representatives of these agencies. Consequently, this Court is unaware of the frequency and content of such services or the degree of success attained by these outside agencies.

On February 29, 2000, child protective services worker John Propst[4] visited the home for approximately twenty minutes and concluded that the Appellant's eight-year-old son John required medical attention for a cut on his face, incurred in a fall on a railroad tie. The Appellant had treated the child's injury, but had not sought medical attention for the injury.[5] Mr. Propst also noticed that the home was dirty and that furniture and bags of clothing cluttered the rooms of the mobile home. As had been the case during the time Mr. Propst had been working with the family, there was no running water coming into the home. There was, however, a water line to the front door of the mobile home where the mother obtained water for flushing the toilet and other purposes. A neighbor had assisted the Appellant in obtaining a water line to the front door of the home.

### B. The Petition, Amended Petition and Preliminary Proceedings

The day after that visit, March 1, 2000, Mr. Propst, acting for the DHHR, filed a petition against the Appellant, alleging that she had neglected her children. The petition alleged that the mobile home was dirty and had no running water. In the petition, Mr. Propst explained that the Appellant had cursed him and "the DHHR for not being there when needed and sticking our noses up her ass when we didn't need to." Mr. Propst further alleged in the petition that the Appellant had failed to keep medical appointments and that a truancy warrant was pending for her failure to send the children to school. No allegations of abuse were filed, and the petition stated that the DHHR did not believe that there existed any imminent danger to the children.

Incident to filing the petition, an order was entered granting emergency powers to the DHHR, and the children were taken to physicians for examinations under the authority of that order. All children were healthy, except two-month old Benny, who had low weight and was diagnosed with failure to thrive. He was admitted for hospitalization on March 1, 2000, and discharged to foster care on March 4, 2000.[6]

The lower court conducted a hearing for further temporary relief on March 9, 2000, and placed the children in the legal custody of the DHHR. Edward, John, David, and George were placed in the physical custody of Mr. David F., the biological father of John, David, and George. The infant, Benny, was placed with the State due to his special medical needs. The Appellant was granted visitation with the children.[7] An amended petition was filed on April 7, 2000, alleging that Benny suffered from failure to thrive and further alleging that the infant suffered a rash where the Appellant had taped a diaper to his skin.

---

4. Mr. Propst had been employed by child protective services for approximately one and one-half years and had been dealing with the Appellant's case for approximately one year.

5. Mr. Propst took John to the emergency room the day after the home visit. John's face was treated conservatively and he was released. An x-ray revealed no broken bones. As the Appellant emphasizes in her brief to this Court, "[t]he treatment provided by the hospital was not much different than the treatment provided by . . . [the Appellant]."

6. Benny had suffered health problems since his December 27, 1999, date of birth. He was taken to the emergency room on January 12, 2000, after his mother called 911 regarding irregular respiration and short apnea episodes. He was admitted for observation from January 12, 2000, to January 14, 2000, while he was still less than one month old. There is no indication in the record concerning what special services, if any, the DHHR provided for Benny's particular health needs prior to the emergency order.

7. The record does not reveal the extent to which the Appellant attempted to exercise visitation with the children subsequent to their removal.

## C. The Adjudication of Neglect

An adjudicatory hearing was held on May 24, 2000, and testimony was taken. Mr. Propst testified concerning the children's medical conditions, school attendance, and missed medical appointments. The lower court asked Mr. Propst why the petition had been filed at this time "[i]f this has been going on in some way, shape or form involving this whole family for about a year or so...." In response, Mr. Propst raised the issue of lice and nits, an issue which does not appear in the petition or amended petition, and explained as follows: "Mainly, the absences of the children from school and the fact that they were coming to school every day with lice, the teachers were sending them home."[8] The lower court then suggested as follows:

> Well, you've been in and out of the home, as well as the others, for, you know, at least twenty times and so forth for a year, did anyone give her any direction or supervision or any help in, you know, getting rid of the mites.... [D]id the Department or anyone else involved do something to find her a better place or a cleaner place or to bring someone in if she was unable to do it....

Mr. Propst responded: "No, sir, we didn't bring anybody in to do that. I was informed that they had a vacuum cleaner, and they could've vacuumed."

During that adjudicatory hearing, the Appellant testified that she had extended running water from the outside into the home. She explained that when Mr. Propst told her to get the water fixed, she was able to obtain running water in the home by paying a neighbor $146.00 to repair the mobile home's broken water pipes after the landlord, residing in Virginia, failed to respond to the Appellant's request for running water and some type of heat other than the coal furnace in the home.

She also testified about her bond with the children, as follows:

> Just that I love my children. They are my life. Nobody can live without air, and I can't live without them. They're the reason I go on. They're the reason I struggle. Sure, I had to pack that water, and it was hard on me, but I didn't make it harder for them. I still kept them clean and stuff. I tried.

When the lower court asked why she had not demanded further assistance with running water from the DHHR, the Appellant responded: "It would be kind of hard to demand that the Department ... do something for me when— I mean, they say I— I miss appointments and things...."

When questioned regarding the family income, the Appellant explained that she received $460.00 per month on behalf of David, based upon his seizure disability, and that she received $312.00 per month in benefits and $148.00 per month in food stamps. Mr. F. also allegedly paid the Appellant $50.00 in support monthly. The record does not disclose how much, if any, of that income ended upon the entry of the temporary relief order on March 9, 2000, transferring custody to persons other than the Appellant.

Having conducted this adjudicatory hearing on May 24, 2000, the lower court entered the resulting order on June 26, 2000,[9] finding that the Appellant had neglected the children. Specifically, the lower court found as follows:

> [The Appellant] failed to provide a safe home for the children, who lived with her in two rooms of a mobile home with dangerous electrical wiring and without hot or cold running water inside the home. She further failed to send the children to school on a regular basis, resulting in her prosecution for truancy, and she failed to seek readily available medical treatment for one of the children even though he had suffered a serious injury to his face that

8. The Appellant testified in response that she used her neighbor's washer and dryer to clean the bed linens and applied lice medication on the children.

9. As will appear, the adjudicatory order was entered *after* the dispositional hearing, some 33 days after the adjudicatory hearing and in plain contravention of the requirements of Rule 27 of the Rules of Procedure For Child Abuse and Neglect Proceedings.

should have received immediate, emergency medical care.

With specific regard to the infant Benny, the court found as follows:

> The Court additionally finds that ... [the Appellant] seriously neglected the basic needs of infant respondent Benny ... [J.] by failing to provide adequate nourishment and emotional support, resulting in the infant being diagnosed by a pediatrician with "failure to thrive" and anemia. Said child had gained only a few ounces in the two months since his birth on December 27, 1999. . . .

The lower court ordered "that the parents continue to have reasonable visitation, contact and communication with the infants under the Department's supervision, but there shall be no forced visitation." The record is silent regarding the degree to which the visitation privileges granted by the lower court were exercised by the Appellant after the adjudicatory hearing.

### D. Activities Prior to Dispositional Hearing

On June 9, 2000, the Appellant filed a written motion for a post-adjudicatory improvement period. The Appellant asserted that she would fully participate in an improvement period and requested a family case plan, in accordance with West Virginia Code 49–6D–3 (1998) (Repl.Vol.2001).

On June 14, 2000, Mr. Propst provided a child youth and family case plan recommending reunification of the family as the permanency plan,[10] with an estimated achievement date of December 12, 2000. There is no indication in the plan, as filed, regarding whether it was preceded by the convening of a multi-disciplinary treatment team, as required by Rule 51 of the West Virginia Rules of Procedure For Child Abuse and Neglect Proceedings, nor does the record contain any order of the court convening such a team.

10. The permanency plan is required by West Virginia Code 49–6–5(a) and Rule 28 of the Rules of Procedure For Child Abuse and Neglect Proceedings.

11. There is no explanation in the plan as to what services Paul Miller Home–Based Services might provide.

The plan identified desired outcomes for the Appellant as follows: problem solving, self-sufficiency, parenting knowledge/skill, and learning the importance of scheduling and being in charge of every day life. Weekly visits by the Paul Miller Home–Based Services were recommended.[11]

### E. Dispositional Hearing

On June 19, 2000, the lower court conducted a dispositional hearing for which it entered its order dated July 10, 2000, despite the requirement of Rule 36 of the Rules of Procedure for Child Abuse and Neglect Proceedings that such an order be entered within ten days of the conclusion of the hearing. At the dispositional hearing, neither the State nor the DHHR objected to the Appellant's request for an improvement period, and counsel for the Appellant informed the lower court that the Appellant was undergoing counseling. The lower court was advised that Dr. Heather Hagerman, a psychologist consulted by the Appellant, had requested a four-week period in which to assess the Appellant's response to counseling and medication, incident to an effort to improve the Appellant's parenting abilities.

The lower court refused to delay its disposition for the requested four-week period, denied the Appellant's request for an improvement period without express findings of fact or conclusions of law, and proceeded to the following dispositions. The court placed exclusive physical and legal custody of John, David, and George with their father, David F. The custody of Edward, whose location was unknown due to the fact that he ran away from Mr. F.'s home, was placed in the DHHR until his eighteenth birthday. With regard to these children, the dispositional order recites that liberal visitation is to be allowed the mother.[12]

12. Again, the record before this Court is silent regarding the degree to which visitation has occurred.

With regard to the infant Benny, the lower court found, in the July 10, 2000, dispositional order, that "there is no reasonable likelihood that ... [the Appellant] can eliminate the conditions which led to the neglect of the child." Consequently, the lower court terminated the Appellant's parental rights to Benny and ordered that he be placed for adoption. The lower court further found that Benny's biological father, Charles C., had abandoned his rights to Benny. The court provided that, upon application of the Appellant at some later date, the Appellant might secure visitation rights with Benny to be exercised under the supervision of the DHHR.

The lower court, through its dispositional order, implicitly rejected the case and permanency plan submitted by the DHHR. Despite the clear requirements of West Virginia Code §§ 49-6-5 and -5a, as well as Rules 36 and 39 of the Rules of Procedure for Child Abuse and Neglect Proceedings, the dispositional order did not require the DHHR to submit a revised plan, a permanency plan, or to conduct a permanent placement review conference.

### II. Standard of Review

■ In syllabus point one of *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996), this Court explained as follows:

Although conclusions of law reached by a circuit court are subject to de novo review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

*See also* Syl. Pt. 1, *In re Travis W.*, 206 W.Va. 478, 525 S.E.2d 669 (1999); Syl. Pt. 1, *In re George Glen B.*, 205 W.Va. 435, 518 S.E.2d 863 (1999).

### III. Discussion
#### A. Inadequate Findings and Determinations

■ As previously noted,[13] the Appellant relies on two alleged errors below: (1) insufficiency of the evidence to warrant the relief awarded against the interests of the Appellant below, and (2) the failure of the lower court to allow a post-adjudicatory improvement period.[14] The Appellant's primary contention on appeal is that the lower court erred by failing to include sufficient findings of fact in its dispositional order to support the termination decision with regard to the infant Benny and the transfer of custody with regard to the other four children. We find this issue of inadequate findings controlling in light of the limited discussion in the record of the factors leading to the lower court's decision and the court's apparent lack of attention to the various requirements of the applicable statutes and rules.[15]

West Virginia Code § 49-6-5(a)(6) enumerates the standards to which courts must adhere in deciding whether parental rights may be terminated. The statute provides that the court must include specific findings within the dispositional order, as follows:

Upon a finding that there is no reasonable likelihood that the conditions of ne-

13. *See supra* note 2.

14. This Court finds that the Appellant has abandoned any allegations of error in the adjudicatory order finding the children neglected, and we therefore treat that order as final.

15. We emphasize that the rules apply only to the extent that they do not conflict with the statutory mandates. Rule 1 of the Rules of Procedure for Child Abuse and Neglect Proceedings provides in pertinent part as follows: "These rules apply only to the extent that they are not in conflict with the Rules of Evidence and other court rules or *statutes* applicable to such proceedings." W. Va. R.P. Child Abuse & Neglect Proc. 1, in part (emphasis provided).

glect or abuse can be substantially corrected in the near future, **and** when necessary for the welfare of the child, terminate the parental, custodial or guardianship rights and/or responsibilities of the abusing parent and commit the child to the permanent sole custody of the nonabusing parent, if there be one, or, if not, to either the permanent guardianship of the department or a licensed child welfare agency. If the court shall so find, then in fixing its dispositional order, **the court shall consider the following factors:** (1) The child's need for continuity of care and caretakers; (2) the amount of time required for the child to be integrated into a stable and permanent home environment; and (3) other factors as the court considers necessary and proper. Notwithstanding any other provision of this article, the court shall give consideration to the wishes of a child fourteen years of age or older or otherwise of an age of discretion as determined by the court, regarding the permanent termination of parental rights. No adoption of a child shall take place until all proceedings for termination of parental rights under this article and appeals thereof are final. In determining whether or not parental rights should be terminated, the court shall consider the efforts made by the department to provide remedial and reunification services to the parent. **The court order shall state:** (1) That continuation in the home is not in the best interest of the child and why; (2) why reunification is not in the best interests of the child; (3) whether or not the department made reasonable efforts, with the child's health and safety being the paramount concern, to preserve the family and to prevent the placement or to eliminate the need for removing the child from the child's home and to make it possible for the child to safely return home, or that the emergency situation made such efforts unreasonable or impossible; and (4) whether or not the

department made reasonable efforts to preserve and reunify the family including a description of what efforts were made or that such efforts were unreasonable due to specific circumstances.

W. Va.Code § 49–6–5(a)(6) (emphasis supplied).[16]

Under West Virginia Code § 49–6–5(a)(5), a trial court may commit the child or children to "a suitable person who may be appointed guardian by the court" where the court finds "that the abusing parent or parents are presently unwilling or unable to provide adequately for the child's needs." *Id.* When this manner of disposition is utilized, as it was for Edward, John, David, and George in this case, the statute provides the following guidance for the court:

> **The court order shall state:** (1) That continuation in the home is contrary to the best interests of the child and why; (2) whether or not the department has made reasonable efforts, with the child's health and safety being the paramount concern, to preserve the family and to prevent or eliminate the need for; removing the child from the child's home and to make it possible for the child to safely return home; what efforts were made or that the emergency situation made such efforts unreasonable or impossible; and (3) the specific circumstances of the situation which made such efforts unreasonable if services were not offered by the department.

W. Va.Code § 49–6–5(a)(5) (emphasis supplied).

Rule 36 of the Rules of Procedure for Child Abuse and Neglect Proceedings has supplemented these statutory requirements by specifying that there shall be findings of fact and conclusions of law set forth in writing or on the record and that the dispositional order shall fix the date and time of the first permanent placement review conference and may include the following information,

---

**16.** In *In re Jamie Nicole H.,* 205 W.Va. 176, 517 S.E.2d 41 (1999), this Court, in dictum, permitted a termination of parental rights to be upheld where the transcript of the dispositional hearing, rather than the order, disclosed, to the satisfaction of this Court, that the lower court found no reasonable likelihood that the conditions of ne-

glect or abuse could be substantially corrected in the near future, as well as the other findings required by West Virginia Code § 49–6–5(a)(6). 205 W.Va. at 184, 517 S.E.2d at 49. We do not find the transcript in the instant case helpful in filling the voids in the dispositional order or procedures.

all of which was omitted from the lower court's order in this case:

(1) Terms of visitation;

(2) Services to be provided to the child and family;

(3) Restraining orders controlling the conduct of any party who is likely to frustrate the disposition order;

(4) Actions to be taken by the parent(s) to correct the identified problems;

(5) Conditions regarding the child's placement, including steps to meet the child's special needs while in placement;

(6) If the child is separated from siblings, steps to unite them and/or to maintain regular contact during the separation if it is in the best interest of each child; and

(7) Terms and conditions of the family case plan or the child's case plan.

W. Va. R.P. Child Abuse & Neglect Proc. 36(c).

■ The lower court's findings regarding the basis for the termination of parental rights with regard to Benny consisted of the following: "It is further ORDERED that the parental rights of ... [the Appellant] with respect to infant Benny ... [J.] be permanently terminated due to this Court's finding that there is no reasonable likelihood that ... [the Appellant] can eliminate the conditions which led to the neglect of the child."

■ Similarly, the lower court failed to make specific findings in its order with regard to the disposition of Edward, John, David, and George. The court's findings with regard to those four children consisted of the following:

Upon due consideration of the Department's recommendations, it is ORDERED that the full and exclusive legal and physical custody of infants John ... [F.], David ... [F.], and George ... [F.] be transferred and awarded to their biological parent, David ... [F.]. [The Appellant] is granted reasonable and liberal contact, communication and visitation with those children.

It is ORDERED that the full and exclusive legal and physical custody of infant Edward ... [B.] be awarded to the West Virginia Department of Health and Human Resources until he becomes 18 years of age.

As it pertains to Benny, the dispositional order fails to state, as required by statute in termination of parental rights cases, why reunification is not in the best interests of Benny, whether the DHHR made reasonable efforts to "preserve the family and to prevent the placement or to eliminate the need for removing the child from the child's home," and whether the DHHR "made reasonable efforts to preserve and reunify the family including a description of what efforts were made or that such efforts were unreasonable due to specific circumstances." W. Va.Code § 49–6–5(a)(6). With regard to the other four children, the order fails to state why reunification with their mother is contrary to their best interests and whether the DHHR has made reasonable efforts to preserve the family and to prevent the need for removal. *See* W. Va.Code § 49–6–5(a)(5).

### B. *Pertinent Requirements of Abuse and Neglect Litigation*

■ Abuse and neglect cases are undoubtedly among the most difficult cases with which our court structure must grapple. The lives of the parties are irretrievably altered by the court rulings, and the people most fundamentally affected are blameless young children. Moreover, as the Supreme Court of the United States recently underlined in *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), the state's involvement with children's and parental rights and privileges implicates substantial liberty interests that enjoy constitutional guarantees of due process of law which must be respected by the state, its legislature, and the courts. Similarly, this Court long ago recognized the constitutional dimensions of abuse and neglect proceedings under both the federal and state constitutions. In syllabus point one of *In re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1973), this Court explained:

In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it

is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

*Id.* at 225, 207 S.E.2d at 130–31; *see also* Syl. Pt. 1, *State ex rel. W. Va. Dep't of Human Servs. v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987).

■ In clear recognition of these critical interests, and by steadfastly adhering to the polar star test of looking to the best interests of our children and their right to healthy, happy productive lives, this Court, over a substantial period of time, has expressed an unwavering interest in providing comprehensive and fair procedures for the consideration of abuse and neglect cases. As this most important area of the law has expanded, this Court has insisted that the directives of applicable rules and legislative enactments must be carefully identified, respected, and incorporated within our court system. The Rules of Procedure for Child Abuse and Neglect Proceedings and the related statutes detailing fair, prompt, and thorough procedures for child abuse and neglect cases are not mere general guidance; rather, they are stated in mandatory terms and vest carefully described and circumscribed discretion in our courts, intended to protect the due process rights of the parents as well as the rights of the innocent children.

■ Procedurally, these various directives also provide the necessary framework for appellate review of a circuit court's action. Where a lower court has not shown compliance with these requirements in a final order, and such cannot be readily gleaned by this Court from the record, the laudable and indispensable goal of proper appellate review is thwarted. As the Supreme Court of Wisconsin emphasized in *In re T.R.M.*, 100 Wis.2d 681, 303 N.W.2d 581 (1981), "[a]dequate findings must be made in order to protect the rights of litigants and to facilitate review of the record by an appellate court." *Id.* at 583. The Wisconsin court also emphasized that the trial court's "findings are also deficient with respect to a lack of a specific and formal determination regarding the best interests of ... [the child]" and noted that the trial court was "under an obligation to make findings with regard to the best interests of the child in relation to the evidence adduced." *Id;* *see also In re Welfare of M.M.*, 452 N.W.2d 236 (Minn.1990) (holding trial court's findings of fact inadequate to facilitate effective appellate review and reversing decision after independent review of record).

■ In *In re Adoption/Guardianship No. 87A262*, 323 Md. 12, 590 A.2d 165 (1991), the Maryland court explained as follows:

[The] legislative requirement of consideration of the factors itemized in [the statute] demonstrates the intent that the utmost caution should be exercised in any decision to terminate parental rights. In cases where parental rights are terminated, it is important that each factor be addressed specifically not only to demonstrate that all factors were considered but also to provide a record for review of this drastic measure.

*Id.* at 168. "Clear and complete findings by the trial judge are essential to enable us properly to exercise and not exceed our powers of review." *Nicpon v. Nicpon*, 9 Mich. App. 373, 157 N.W.2d 464, 467 (1968); *see In re Denzel A.*, 53 Conn.App. 827, 733 A.2d 298 (1999) (holding that trial court mandated to consider and make written findings of fact regarding statutory factors in dispositional phase of termination of parental rights hearing).

### C. The Process for Disposition of Abuse and Neglect Cases

This State has developed a thorough process for the disposition of cases involving children adjudicated to be abused or neglected. Pursuant to Rule 51 of the Rules of Procedure for Child Abuse and Neglect Proceedings, a multidisciplinary treatment team, as defined in West Virginia Code §§ 49–5D–1 to –7 (1998) (Repl.Vol.2001), is to be convened for each abuse and neglect case within thirty days of its filing, consisting of the parties and representatives of agencies who may be able to help in the particular situation. Rule 28 contemplates that a child's case plan is to be prepared, with the specific and detailed contents to be determined by

the recommendations included therein and the applicable provisions of West Virginia Code § 49–6D–3, and timely filed with the court. *See* W. Va. R.P. Child Abuse and Neglect Proc. 28.

Furthermore, Rules 29 to 31, 34, and 36 to 42 of the Rules of Procedure for Child Abuse and Neglect Proceedings and the related statutes provide an orderly but prompt process for bringing about a full consideration of the best interests of children adjudicated to be neglected or abused and the proper disposition of such cases. The Rules provide a full opportunity for hearing, judicial consideration of the case plan and its possible revision, and timely disposition of the case under the provisions of West Virginia Code § 49–6–5, with adequate findings in the order or on the record. The Rules further provide stringent guidelines and time limitations for any improvement period granted and timely follow-up regarding the efficacy of any plan for the permanent placement of the child or children outside the parental home.

### D. Deficiencies in the Management of the Instant Matter

 In the case *sub judice,* these procedures simply were not followed. Specifically, nothing in the record suggests the convening of the required multidisciplinary team or its consideration of or input into the child's case plan submitted by the child protective services worker, Mr. Propst. A review of that case plan demonstrates beyond question that it fails to satisfy the requirements of West Virginia Code § 49–6D–3, as also identified by this Court in syllabus point five of *Cheryl M.,* as follows: "The purpose of the family case plan as set out in W.Va. Code, 49–6D–3(a) (1984), is to clearly set forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening these problems." 177 W.Va. at 689, 356 S.E.2d at 182, syl. pt. 5. The case plan in the instant matter neither "clearly set[s] forth an organized realistic method of identifying family problems and the logical steps to be used in resolving or lessening those problems" nor does it address satisfactorily, if at all, the specific

matters required by West Virginia Code § 49–6D–3. *Id.*

Although the family case plan was formulated and submitted to the lower court prior to the dispositional hearing, the strategies recommended in the plan were never employed to address the family's problems. Similar strategies may have been utilized in previous contact between the DHHR and the Appellant, but the forms of outreach referenced in the plan were not attempted. Additionally, the family case plan does not appear to adequately address one of the predominant obstacles facing the Appellant, her alleged lack of financial resources. It does suggest the use of Paul Miller Home–Based Services for weekly monitoring and guidance in instructing the Appellant in scheduling her normal routines. Yet it does not otherwise appear to identify precise methods by which the Appellant might improve her parenting skills, and many desired outcomes are stated in abstract terms, such as "problem solving," "self-sufficiency," and "parenting knowledge/skill."

Moreover, it appears that the court below rejected the case plan during the dispositional hearing after the father of three of the children objected and asked the court to proceed to terminate the Appellant's parental rights, contrary to the child case plan filed by the DHHR, and the court proceeded to terminate Appellant's parental rights. In contrast to this procedure, Rule 34 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings requires the court to rule by order on the case plan and, if the court rejects the plan, order the DHHR to submit a revised plan within thirty days and schedule a new dispositional hearing within forty-five days. In violation of Rule 36, the lower court failed to set the date and time for the first permanency review conference.

### E. Conclusions

 This Court concludes that where a trial court order terminating parental rights merely declares that there is no reasonable likelihood that a parent can eliminate the conditions of neglect, without explicitly stating factual findings in the order or on the record supporting such conclusion, and fails

to state statutory findings required by West Virginia Code 49–6–5(a)(6) on the record or in the order, the order is inadequate. Likewise, where a trial court removes a child from the custody of an allegedly neglectful parent and places exclusive custody in another individual, the court must adhere to the mandates of West Virginia Code 49–6–5(a)(5), and failure to include statutorily required findings in the order or on the record renders the order inadequate. Accordingly, where it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children adjudicated to be abused or neglected has been substantially disregarded or frustrated, the resulting order of disposition will be vacated and the case remanded for compliance with that process and entry of an appropriate dispositional order.

Based upon the lower court's numerous failures to comply with the statutory requirements and the procedures required by the Rules of Procedure for Child Abuse and Neglect Proceedings, this matter must be reversed and remanded. As promptly as may appear feasible to the trial court, this matter shall be brought on for the development of an appropriate family and child case plan, including the utilization of a multidisciplinary team;[17] a determination of the propriety of an improvement period; subsequent improvement period hearings, if an improvement period is granted; a full dispositional hearing and decision; and such permanency conferences, plans, hearings, foster care reviews, and status conferences as the lower court concludes will bring this matter to prompt closure, with due regard to the Rules of Procedure For Child Abuse and Neglect Proceedings.

## IV. Issues for Evaluation on Remand

### A. Entitlement to an Improvement Period

The Appellant contends that the lower court erred in the dispositional phase by denying her an improvement period.[18] The Appellant made a written motion for an improvement period prior to the dispositional hearing, and her counsel explained that her psychologist had requested a four-week period in which to assess the Appellant's progress. The motion for an improvement period was not opposed by the DHHR or the guardian ad litem.[19] In fact, the position of the DHHR, as evidenced by its family case plan, appears to have supported the motion by providing a permanency plan calling for reunification by December 2000.

In *State ex rel. Amy M. v. Kaufman*, 196 W.Va. 251, 470 S.E.2d 205 (1996), this Court explained its position of improvements periods, as follows: "The goal of an improvement period is to facilitate the reunification of families whenever that reunification is in the best interests of the children involved." *Id.* at 258, 470 S.E.2d at 212. We recognized that "[b]oth the statute and our

---

17. In the special circumstances of this case, to avoid further interminable delays, we see no impediment to the lower court requiring, if it wishes to do so, the inclusion of alternative plans in the case plan such as (1) granting; or (2) denying an improvement period; (3) the continuation of the custody of the children other than Benny with Mr. David F.; (4) any appropriate alternative to that placement; (5) the placement of Benny for adoption; (6) the eventual reunification of Benny with the Appellant; (7) visitation plans for the siblings, the Appellant, and/or other parties entitled thereto, if desirable; and (8) such other matters as the lower court shall require, so long as the parties have ample notice and opportunity to be heard on all alternatives. Finally, when a plan is prepared, with plans for alternative dispositions, it is imperative that the directives of Rule 28 of the Rules of Procedure For Child Abuse and Neglect Proceedings and West Virginia Code § 49–6D–3 be carefully followed in order to provide the trial court and all interested

parties an opportunity for thorough reflection on the realistic alternatives available to serve the best interests of the children involved and fairly afford Appellant and other concerned parties an opportunity to resolve the serious problems evidenced by this case and its course to date.

18. This Court recognizes the more stringent requirements of West Virginia Code 49–6–12 (1996) (Repl.Vol.2001), with regard to post-adjudicatory improvement periods, as requested by the Appellant in the case *sub judice.*

19. The motion was opposed by Mr. David F., the biological father of four of the six children. Counsel for Mr. F. explained that Mr. F. was "of the opinion that no good will result from an improvement period because his ex-wife has had time and time again the opportunity to do better by the children. . . ."

case law grant trial courts considerable flexibility in developing meaningful improvement periods designed to address the myriad possible problems causing abuse and neglect." *Id.* at 258, 470 S.E.2d at 212; *see also In re Emily,* 208 W.Va. 325, 540 S.E.2d 542 (2000). Additional guidance is found in syllabus point four of *In re Carlita B.,* 185 W.Va. 613, 408 S.E.2d 365 (1991):

> In formulating the improvement period and family case plans, courts and social service workers should cooperate to provide a workable approach for the resolution of family problems which have prevented the child or children from receiving appropriate care from their parents. The formulation of the improvement period and family case plans should therefore be a consolidated, multi-disciplinary effort among the court system, the parents, attorneys, social service agencies, and any other helping personnel involved in assisting the family.

■ We are puzzled by the lower court's refusal of the four-week delay in the dispositional hearing to determine if the children might profit from such an improvement peri-od when the lower court itself delayed the entry of the dispositional order nearly that long, from June 19, 2000, to July 10, 2000. We cannot ascertain from the record before us, however, the basis for the lower court's decision not to grant the requested improvement period. Accordingly, the lower court should reexamine its determination regarding the propriety of an improvement period. The determination of whether to grant an improvement period is discretionary with the trial court and our discussion here should not be read either as favoring or disfavoring the grant of such a period in this case. We leave that to the lower court.

### B. Other Considerations

■ This Court is confident that the lower court, on remand, will also consider such supplementary issues as the following: (1) the effect of the passage of time upon the children;[20] (2) the Appellant's financial constraints;[21] (3) a gradual, but reasonably prompt, transition period for the children where alteration in custody is necessary;[22] (4) the children's rights to continued association;[23] and (5) evaluation of propriety of the

---

**20.** This Court has consistently recognized child abuse and neglect cases as high priority. *See* Syl. Pt. 1, in part, *In re Carlita B.,* 185 W.Va. at 615, 408 S.E.2d at 367 ("Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security"). We are troubled by the long period of time it has taken this case to move from the entry of the dispositional order below to its consideration and decision by this Court, particularly in view of our oft-stated interest in prompt disposition of these cases However, in the particular case presently before this Court, the delay cannot be said to be the fault of any of the parties. Original counsel for the Appellant was compelled to withdraw, and substitute counsel twice requested, and this Court granted, enlargements of time within which to file a brief with this Court.

**21.** The Appellant suggests that poverty prevented her from maintaining a suitable home and emphasizes that West Virginia Code § 49-1-3(h)(1) (1999) (Repl.Vol.2001) specifies that the conditions allegedly constituting neglect cannot arise from a lack of financial means. While the issue of neglect has been determined, the lower court should endeavor on remand to distinguish derelictions of the mother attributable to her personal lack of ability and/or desire to parent the child from omissions primarily occasioned by a lack of

financial means. Any child and family case plan proposing reunification should clearly address measures designed to assist with financial obstacles.

**22.** We emphasize that we are not recommending any particular disposition in this case. However, if reunification is determined to be appropriate for any of the children upon remand, such children's custody arrangements should be altered gradually, within a fixed time frame, to minimize disruption to their young lives. *See* Syl. Pt. 3, *James M. v. Maynard,* 185 W.Va. 648, 408 S.E.2d 400 (1991).

**23.** In syllabus point four of *James M. v. Maynard,* 185 W.Va. 648, 408 S.E.2d 400 (1991), this Court explained:

> In cases where there is a termination of parental rights, the circuit court should consider whether continued association with siblings in other placements is in the child's best interests, and if such continued association is in such child's best interests, the court should enter an appropriate order to preserve the rights of siblings to continued contact.

Through syllabus point five of *In re Christina L.,* 194 W.Va. 446, 460 S.E.2d 692 (1995), this Court expanded that concept, as follows:

> When parental rights are terminated due to neglect or abuse, the circuit court may never-

termination of Charles C.'s parental rights.[24]

Based on the foregoing, we hereby reverse the July 10, 2000, decision of the Circuit Court of McDowell County and remand this matter for further proceedings and evaluation consistent with this opinion. Based upon the time problems discussed earlier, the mandate herein shall issue forthwith. While this Court is cognizant that thorough evaluation on remand may consume significant time for the honorable judge to whom this matter will be assigned, this Court respectfully recommends that the lower court make all reasonable efforts to promptly conclude these proceedings, to the end that these children may enjoy a stable and certain future as early as is practicable. The urgency of the lower court's further consideration is underscored by the seriousness of these matters, as well as the fact that considerable delays, over which no party had control, were encountered in the proceedings.

Reversed and Remanded With Directions.

theless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest.

As we explained in *In re Brian D.*, 194 W.Va. 623, 461 S.E.2d 129 (1995), a court should "inquire into the relationship ... [the child] has formed with his foster parents and, if it is in his best interests, fashion a plan for continued association between the foster parents and the child." *Id.* at 638, 461 S.E.2d at 144.

24. If the lower court determines that Benny should be reunified with the Appellant, the court

should also reevaluate the decision to terminate the rights of Benny alleged natural father, Mr. Charles C. According to the record before this Court, it does not appear that a paternity action has been brought against Mr. C., nor has any child support been paid. Similarly, it appears that no paternity action has been brought against Edward's natural father. Although the termination decision regarding the father has not been appealed, it appears that the termination decision was presumably made to facilitate Benny's adoption. If the Appellant's rights are not terminated after consideration on remand, adoption is no longer an issue, and the Appellant's rights to receive support from the natural father would be negated by termination of the father's parental rights. *See Swinney v. Mosher*, 830 S.W.2d 187 (Tex.Ct.App.1992) (holding that termination of father's parental rights should be reversed since it was done to facilitate child's adoption and would prejudice rights of child and mother to receive support from father).