STATE OF WEST VIRGINIA

SUPREME COURT OF APPEALS

*In re* M.L.

No. 19-0219 (Kanawha County 16-JA-569)

**FILED**
**May 8, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**MEMORANDUM DECISION**

Petitioner W.B.[1] appeals the Circuit Court of Kanawha County's February 7, 2019 disposition order granting permanent guardianship of the child, M.L., to the child's maternal great aunt.[2] The West Virginia Department of Health and Human Resources (DHHR)[3] and the guardian ad litem (guardian)[4] filed responses in support of the circuit court's order. W.B.'s contention on appeal is that the DHHR unjustly removed M.L. from her placement with W.B. based on insufficient evidence of child abuse and neglect and without a meaningful improvement period.

Upon consideration of the standard of review, the briefs, the record presented, and oral argument, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the West Virginia Rules of Appellate Procedure.

## I.    Factual and Procedural Background

On July 9, 2012, when M.L. was nearly six months old, her mother, G.L., signed and notarized a document giving temporary custody of M.L. to W.B.[5] W.B. is not a blood

---

[1] Petitioner is represented by counsel Matthew A. Victor, Esq.

[2] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013).

[3] The DHHR is represented by counsel S.L. Evans, Esq.

[4] Bryan B. Escue, Esq. serves as guardian ad litem.

[5] According to testimony and evidence presented below, G.L. executed similar documents with other individuals with respect to her other children. G.L.'s other children are not the subject of this appeal.

1

relative, but according to the mother, W.B. had "always been there ever since [M.L.] was born." There is conflicting testimony as to whether M.L. remained in W.B.'s sole custody from that point forward, but W.B. was M.L.'s primary custodian. In 2016, the mother became the subject of an abuse and neglect petition in relation to her criminal charges for purchase of controlled substances that she conducted while her children were in the car.[6] In addition to alleging that drug use substantially impaired the mother's ability to parent, the Petition alleged that the children had been dropped off with various custodians throughout their lives without any permissions, orders, or other information that would permit those custodians to obtain medical care or benefits. Based on the allegations in the Petition, the DHHR was granted temporary legal and physical custody of the children, but the court ordered that the children remain in placement with their respective custodians.[7] Because M.L. was residing with W.B. at the time the Petition was filed, W.B. was named in the Petition and appointed counsel.

The original Petition contained no allegations of abuse and neglect against W.B. However, at the preliminary hearing, the circuit court ordered all parties to undergo a drug screening during which W.B. tested positive for alcohol, marijuana and cocaine. The DHHR filed an Amended Petition to that effect, and the child was removed from W.B.'s home.[8] W.B. was required to undergo frequent drug screenings, but M.L. was placed back into W.B.'s home.[9]

On Saturday, July 15, 2017, the DHHR went to W.B.'s home, removed M.L. from her custody, and placed her with L.M., a great aunt who was already the custodian for

---

[6] Six children are the subject of the underlying petition, and those children have different or unknown fathers and different custodians. Problematically, despite the fact that the six children listed in the Petition are in the custody of various different individuals as opposed to their mother, the Petition does not parse out which allegations refer to which child or which custodian-respondent. However, there is no evidence in the record to indicate that M.L. was one of the children in the vehicle, nor does the DHHR appear to have alleged as much.

[7] Although the Petition alleges that W.B. is the legal guardian of M.L., W.B. stated to the circuit court that she did not have a legal guardianship in place. Rather, M.L. was residing with her at the time the proceedings against the mother were instituted.

[8] While the Amended Petition does contain an allegation against W.B. and one other custodian who also failed the drug screening, the record before this Court indicates that the State did not pursue those allegations in the form of adjudication or otherwise.

[9] Later in the proceedings, the State ultimately requested that the court discontinue the drug screenings since W.B. had not failed any screening after the one administered at the preliminary hearing.

M.L.'s half-sibling, M.F.[10] W.B. filed a motion with the circuit court to challenge that removal as soon as was practicable. The circuit court held a hearing on the motion on August 2, 2017. During the hearing, W.B.'s counsel elicited testimony regarding the removal from Crystal Pauley, an employee of Children First. Ms. Pauley had performed a home study on W.B.'s home and recommended that W.B.'s home study not be approved because W.B.'s magistrate court check came back with a felony possession charge from 2005, and three misdemeanor charges for possession, trespassing, and public intoxication from 2005. W.B., when initially provided placement of M.L. at the beginning of the case, had marked in her paperwork that she had not been convicted of any crime, pled guilty, or pled nolo contendere to any crime. Additionally, it appeared that W.B. had not yet completed her physical examination with a physician.

As to the criminal charges, Ms. Pauley admitted that she did not follow up with the circuit court to determine what had been the disposition of the felony charge, and W.B.'s counsel represented to the court that it had been pleaded down to a misdemeanor. Ms. Pauley also confirmed that while it appeared that the misdemeanor charges had not been dismissed, she did not know the ultimate disposition of those charges either.

With respect to W.B.'s home, Ms. Pauley testified that while she was concerned with W.B.'s debt-to-income ratio, M.L. was well cared for, had proper food, shelter, clothing, toys, and "everything that every other child would desire." Ms. Pauley testified that M.L. called W.B. "mom," had an attachment to her, and was happy in the home. Yet, due to the criminal charges, debt-to-income ratio concerns, and lack of a physical exam, Ms. Pauley recommended that the home study be denied. Although Ms. Pauley made recommendations as to home studies, she did not have the authority to approve or deny them. That authority lies with the DHHR.

W.B. then elicited testimony from DHHR worker Jessica Stewart. Ms. Stewart testified that she confirmed there was no felony record, but there were two misdemeanors reported. Likewise, at the beginning of July 2017, Ms. Stewart was directed to municipal court where she was informed that W.B. had two outstanding warrants for open container charges from 2011 and 2013. Ms. Stewart testified that it was DHHR policy that a prospective foster or kinship placement cannot have any active warrants or be on parole, and when a home study is denied, it is recommended to remove the child. Ms. Stewart stated that her supervisors could suggest she get a waiver, and that she supposed the judge "in one sentence [could] waive all this nonsense." However, those warrants were never

---

[10] L.M. admitted to asking the DHHR to place M.L. with her because the family did not want her placed with W.B. L.M. also wrote ex parte communications to the circuit court expressing disagreement with the court's decision to place M.L. with W.B. Further, there is evidence in the record to suggest that L.M. coached M.L. to say things she would not be able to articulate at age five, including remarks that W.B. had no "style" or "class," which, as pointed out by the guardian, are atypical remarks of a five-year-old.

3

investigated further, and W.B. presented a pretrial diversion agreement to demonstrate that those warrants had been resolved. According to Ms. Stewart, the home study was denied on July 27, 2017, when the recommendation was presented to her supervisors – twelve days after the child had already been removed from W.B.'s home.

L.M. then testified that she was informed on Friday, July 14, 2017, that she would be receiving placement of M.L. the following day and to take steps to obtain a medical card for her. Neither the guardian, W.B., nor the court were informed that the child was going to be removed from W.B.'s home. L.M. enrolled M.L. in kindergarten the following Tuesday, so by the time of the hearing on her removal, M.L. had been in school for approximately two weeks.

The circuit court and the guardian agreed that the removal of M.L. from W.B.'s home was a "tremendous" error. The circuit court found that the DHHR had improperly removed M.L. where there was no danger, no review by the guardian or the attorneys representing the DHHR, and no court approval. And, the circuit court expressed its belief the situation had been manipulated to remove custody from W.B. Despite the error in removal, the guardian believed that it might be damaging to M.L. to tear her from the school she had just begun and place her back with W.B. where she would begin a new school shortly after. Likewise, L.M. maintained custody of M.L.'s sister, M.F., and M.L. had formed an attachment to her sister despite being apart for five years. For those reasons, the guardian recommended that the court not punish a child for the wrongdoings of the DHHR and to maintain placement with L.M. so as not to cause another upheaval in M.L.'s life. The circuit court took the guardian's recommendation, and changed placement of M.L. to L.M. and ordered that W.B. receive unsupervised weekend visitation.

L.M. maintained custody of M.L. throughout the remainder of the proceedings, and W.B.'s visitation was abbreviated from every weekend to once or twice per month in order to accommodate visitation with the mother, who was granted an improvement period. At the disposition hearing, the mother agreed to relinquish her custodial rights in the form of permanent legal guardianships with their current placements. As to M.L., the mother testified that she felt it was in M.L.'s best interest to stay with L.M. and M.L.'s sister, but that "[W.B.] should be in [M.L.'s] life. She's always been in her life." The guardian also attested that M.L. had a significant attachment to her sister, who was placed with L.M. The circuit court concluded that a permanent legal guardianship with L.M. was in M.L.'s best interests, with visitation between M.L. and W.B. to be addressed at future multi-disciplinary team meetings. Petitioner appeals that final disposition order.

## II.     Standard of Review

We evaluate the circuit court's disposition order in this case from a deferential viewpoint:

4

In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review. [11]

Specific to the abuse and neglect context, we have also established a deferential standard of review:

Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.[12]

### III.    Discussion

On appeal, W.B.'s only contention is that M.L. was unjustly removed from her custody and permanently placed with L.M. without providing W.B. a meaningful improvement period. At the heart of W.B.'s claim, however, is the misconception that M.L. was removed from her custody for abusing and/or neglecting M.L. Rather, M.L. was removed from her custody for failing a home study that, based upon the investigation completed by the DHHR, would have precluded M.L.'s permanent placement with W.B. Notwithstanding that W.B. has provided no authority to support her assertion that her rights

---

[11] Syl. Pt. 2, *Walker v. W. Va. Ethics Comm'n*, 201 W. Va. 108, 492 S.E.2d 167 (1997).

[12] Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

as a pre-petition custodian are tantamount to those of a natural parent, under these facts, that argument is irrelevant.[13]

It is undisputed and we recognize that the DHHR's removal of this child from W.B.'s custody was done improperly. Not only were the grounds for removal factually precarious and the investigation into those facts cursory, but the DHHR also appears to have given no thought to the impact on this child of tearing her from the only home she had ever known. We are appalled at the idea that the DHHR would have intentionally removed a child on a Saturday in order to preclude court intervention when that removal was not an emergency removal under West Virginia Code § 49-4-602(c). This removal was reportedly made pursuant to DHHR policy. The DHHR ignores that M.L. was placed with W.B. by *court order*. In the absence of emergency circumstances, which were clearly not present here, the DHHR had no unilateral authority to change the custody of a child from that determined by court order without court approval. That the DHHR removed this child under these circumstances without court approval and without even notifying the guardian is inexcusable.

However, this Court is not tasked with reviewing alleged error by the DHHR, but by the circuit court. Here, the circuit court held a placement review hearing after the removal. W.B. was provided meaningful opportunity to be heard and presented and cross-examined witnesses. The circuit court indicated that the placement issues W.B.'s criminal history presented could have, and *should have* been addressed and ruled on by the court prior to removal, but nonetheless recognized its inability to rewind the clock and made a decision that it believed to be in the child's best interests going forward. The record is plain that the circuit court agonized over the practical realities that would result from the DHHR's hasty actions, but found that the child's best interests dictated placement with L.M., and to provide W.B. with a liberal visitation schedule. That decision is supported both by the guardian's recommendation that further disruption might be harmful to M.L., particularly as she had just started kindergarten at a new school, and the guardian's observation that M.L. was forming a bond with her sister who resided with L.M. Given that there is sufficient evidence in the record to support the placement decision rendered by the circuit court, it is not the province of this Court to substitute our own judgment, and we cannot conclude that the circuit court erred in maintaining M.L.'s placement with L.M.

For similar reasons, we do not find that the circuit court erred in permanently placing M.L. with L.M. As attested to by the guardian, M.L.'s bond with her sister became stronger over the course of the proceedings. Both children reportedly benefitted from being in the same home. M.L. was in an environment "conducive to her education," was provided

---

[13] In addition to this material distinction that the basis of removal was not an allegation of abuse or neglect, the record does not indicate that W.B. even requested an improvement period in compliance with West Virginia Code § 49-4-610 and, therefore, we do not find error in the circuit court's failure to provide W.B. an improvement period.

stability, and by all accounts was doing well in L.M.'s care. While W.B.'s argument that the DHHR's actions set this case on a different course for disposition is well-taken, the circuit court nonetheless made the initial decision to change the placement of M.L. based on the best interests of the child, and made the ultimate decision to place M.L. in a permanent guardianship with L.M. based on the best interests of the child. It is that standard that reigns supreme in abuse and neglect proceedings:

> Indeed, if one thing is firmly fixed in our jurisprudence involving abused and neglected children, it is that the "polar star test [is] looking to the best interests of our children and their right to healthy, happy productive lives[.]" *In re Edward B.*, 210 W. Va. 621, 632, 558 S.E.2d 620, 631 (2001). This Court has repeatedly stated that a child's welfare acts as "the polar star by which the discretion of the court will be guided." *In Re: Clifford K.*, 217 W. Va. 625, 634, 619 S.E.2d 138, 147 (2005)[.][14]

Because the circuit court had ample evidence before it that a permanent guardianship with L.M. was in the best interests of M.L., we find no error in the exercise of that discretion.

### IV.  Conclusion

For the reasons stated above, the February 7, 2019 order of the Circuit Court of Kanawha County is affirmed.

Affirmed.

**ISSUED:** May 8, 2020

**CONCURRED IN BY:**

Chief Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

---

[14] *In re Timber M.*, 231 W. Va. 44, 59, 743 S.E.2d 352, 367 (2013).