# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

*In re* **A.D. and P.D.-1**

**No. 25-770** (Raleigh County CC-41-2025-JA-95 and CC-41-2025-JA-96)

## MEMORANDUM DECISION

Petitioner Jennifer Dempsey Meeteer, guardian ad litem for A.D. and P.D.-1,[1] appeals the Circuit Court of Raleigh County's October 24, 2025, order dismissing the abuse and neglect petition, arguing that such dismissal was erroneous.[2] Upon our review, we determine that oral argument is unnecessary and that a memorandum decision reversing the circuit court's October 24, 2025, order and remanding for further proceedings is appropriate, in accordance with the "limited circumstances" requirement of Rule 21(d) of the West Virginia Rules of Appellate Procedure.

On October 3, 2025, the DHS filed a petition alleging that the parents abused and neglected the children due to "the unsafe and deplorable conditions of the family home, and the lack of sufficient food for the children." According to the DHS, Child Protective Services ("CPS") received a referral on September 19, 2025, reporting that between fifty and eighty dogs lived in the home, which was covered in dog feces and urine, and that the home contained cockroaches, broken windows, chewed up furniture, exposed wires, and molded food, among other things. Upon investigation, CPS workers observed that the home was "laden with [dog] feces and urine" with an "odor [that was] immensely strong with ammonia and dog feces," and that the children's beds were "mattresses lying on the floor, covered in urine and feces stains, and with holes chewed in them from the dogs." However, CPS also learned that neither child was living in the home at the time. In an interview with a CPS worker, then-fourteen-year-old P.D.-1, reported that she was staying with her maternal aunt because the parents' home had "70 dogs, no dog pads, and they pee and poop everywhere," while A.D., who was sixteen years old, reported that she was staying at a friend's house because of the CPS referral. On September 25, 2025, the DHS implemented a seven-day safety plan,[3] which prohibited the children from returning home. Additionally, the DHS

---

[1] The West Virginia Department of Human Services ("DHS") appears by Attorney General John B. McCuskey and Assistant Attorney General James Wegman. The Respondent Mother, S.D., appears by counsel Joshua D. Brown and Morgan E. Wilkes. The Respondent Father, P.D.-2, appears by counsel Melinda A. Cooper.

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e). Further, because P.D.-1 and Respondent Father, P.D.-2, share the same initials, we use numbers to differentiate them.

[3] A copy of the safety plan was not included in the appendix.

arranged for a dumpster to be placed at the home to aid the parents in cleaning it out. However, when CPS workers returned on October 1, 2025, they observed "very little improvement" in the condition of the home. As a result, the DHS filed the petition and requested temporary legal and physical custody of the children. On October 6, 2026, the circuit court entered an initial order, finding that there was imminent danger to the children and no reasonable alternative to removal. Therefore, legal and physical custody of A.D. and P.D.-1 was transferred to the DHS.

On October 14, 2025, the circuit court held a preliminary hearing. The DHS presented testimony from a CPS worker, the father, and the mother. The CPS worker testified consistently with the allegations in the petition and explained that, during her first visit to the home on September 22, 2025, she saw between twenty-five and thirty dogs, was only able to take about two steps into the home "due to the strong ammonia smell and the strong odors from the home," and was unable to see the floor of the home "due to the amount of feces." The CPS case worker then explained that, during her second visit to the home on October 1, 2025, she managed to take six to eight steps into the home, but "the smell brought tears to [her] eyes, and [her] eyes burned so bad." She added that "the smell was [so] breathtaking that [she] couldn't go any further, even with a mask over [her] face." She stated that during this second visit "there seemed to be a couple of less dogs," but the parents had not "made any progress with cleaning" as "things were more shuffled around, not so much picked up." The CPS worker also recounted conversations she had with the parents during her home visits. Specifically, she explained that the mother told her that the home was not that bad, while the father admitted that the home had "gotten out of hand" and suggested that the children should help them clean the home, move the furniture, and take care of the animals. Finally, the CPS worker testified that the children were living in the home as recently as the week prior to receiving the initial referral.

The father testified that the home was not suitable for the children, but he was unsure how long it would take to make the home habitable because he was "the only one that c[ould] do anything," further asserting that he had multiple health problems and that the mother was disabled. The father further testified that, while there were originally approximately fifty dogs living in the home, this number had been reduced to approximately twenty, and that animal control began removing dogs from the house before CPS's first visit. The father claimed that the children had not lived in the home for several weeks. He estimated that A.D. had been staying with a friend for "almost two weeks" when the DHS received the initial referral and that P.D.-1 had been staying with a friend since "the end of the summer" before staying with the aunt. The father explained that he signed a handwritten document granting permission for the aunt to have temporary custody of A.D. on September 18, 2025, and he signed a similar document on October 1, 2025, granting permission for the parent of A.D.'s friend to have temporary custody of A.D. In support of this claim, the father introduced both documents into evidence. The mother agreed with the father's testimony but asserted that "it should be [her] choice when" the children return home and did not "think [CPS] need[ed] to be involved." The mother also testified that, in the middle of September 2025, she asked the aunt to take custody of P.D.-1 because of personal problems and the poor condition of the home.

After the presentation of evidence, the parents moved to dismiss the case, arguing that the children could not be abused or neglected because they were not living in the home at the time the DHS filed the petition. The DHS and the petitioner objected to the motion, arguing that dismissal

was not appropriate because the parents could revoke the children's living arrangements at any time. Ultimately, the circuit court dismissed the petition, finding that, although the parents admitted that the home was not suitable for children, "there was no imminent danger at the time of the filing of the petition because the children were not in the home." The court ordered "that the children are to be returned to their respective living arrangement that was in place at the time of the filing of the petition." The petitioner appeals from the dismissal order.

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo. Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). Before this Court, the petitioner argues that the circuit court erred in finding that the children were not in imminent danger and in dismissing the petition at the preliminary hearing based upon that finding.[4] We agree. According to Rule 3(g) of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, the purpose of a preliminary hearing is to determine, among other things, "whether there is reasonable cause to believe that the child is in imminent danger," and "whether continuation in the home is contrary to the welfare of the child." West Virginia Code § 49-1-201 defines "[i]mminent danger to the physical well-being of the child" to mean "an emergency situation in which the welfare or the life of the child is threatened," which includes any "condition that threatens the health, life or safety of any child in the home." Here, the parents admitted that the home was in a deplorable condition and unsafe for the children. Although the children were not living in the home at the time the DHS filed the petition, the evidence indicates that they lived in the home immediately prior to filing, that the parents transferred physical custody of the children because of CPS involvement, that the children were not in legal guardianships, and that neither the parents nor the custodians had commenced guardianship proceedings. Thus, nothing prevented the parents from demanding that the custodians return the children to their custody at any point, thereby constituting an ongoing threat to the children. Further, the parents indicated that the children should help clean the home, and the mother testified that it should be up to her when the children returned home. As such, the record demonstrates reasonable cause to believe that the children were in imminent danger as continuation in the parents' home threatened their physical well-being. Moreover, it is abundantly clear that continuation in the home would be contrary to the children's welfare.

Furthermore, even if the children were not in imminent danger, the circuit court erred in dismissing the petition based upon that finding. West Virginia Code § 49-4-601, which outlines the requirements for filing an abuse and neglect petition, "does not include a requirement that a child be in imminent danger." *In re S.B.*, No. 19-0583, 2020 WL 598884, at *3 (W. Va. Feb. 1, 2020) (memorandum decision); *see also State ex rel. Virginia M. v. Virgil Eugene S. II*, 197 W. Va. 456, 460, 475 S.E.2d 548, 552 (1996) (explaining that West Virginia Code § 49-4-601 "provides the appropriate procedure for resolving non-emergency abuse or neglect situations"). Indeed, we have explained that "when . . . the child is not in imminent danger, the [circuit] court

---

[4] The petitioner also argues that the circuit court's order failed to contain sufficient findings of fact and conclusions of law. We need not address the merits of this assignment of error because we are reversing the order and remanding for further proceedings. Nonetheless, we remind the circuit court that "[c]lear and complete findings by the trial judge are essential to enable [the appellate court] properly to exercise and not exceed our powers of review." *In re Edward B.*, 210 W. Va. 621, 632, 558 S.E.2d 620, 631 (2001).

can thus consider whether the child is abused or neglected *prior* to a transfer of custody." *State ex rel. Virginia M.*, 197 W. Va. at 460, 475 S.E.2d at 475. As such, it is clear that dismissal was in error.

For the foregoing reasons, we reverse the circuit court's October 24, 2025, order dismissing the petition and remand this matter to the circuit court for further proceedings consistent with this opinion. At minimum, the circuit court is directed to enter an order transferring the legal and physical custody of the children to the DHS, hold an adjudicatory hearing in accordance with West Virginia Code § 49-4-601 and Rule 25 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, and undertake any additional proceedings consistent with the applicable rules and statutes. The Clerk is directed to issue the mandate contemporaneously herewith.

Reversed and remanded, with directions.

**ISSUED:** May 6, 2026

**CONCURRED IN BY:**

Chief Justice C. Haley Bunn
Justice William R. Wooton
Justice Charles S. Trump IV
Justice Thomas H. Ewing
Justice Gerald M. Titus III