IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2022 Term

_____

No. 21-0362

_____

**FILED**

**May 27, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE K.B.-R. AND L.R.

_____

Appeal from the Circuit Court of Marshall County
The Honorable David W. Hummel, Jr., Judge
Case Nos. 19-JA-055 and 19-JA-056

VACATED AND REMANDED WITH DIRECTIONS
_____

Submitted: February 15, 2022
Filed: May 27, 2022

Sherrilyn VanTassel, Esq.
TORISEVA LAW
Wheeling, West Virginia
Counsel for Petitioner Mother

Thomas E. White, Esq.
White Law Office
Moundsville, West Virginia
Guardian ad Litem for the Minor Children

Mark D. Panepinto, Esq.
Panepinto Law Offices
Wheeling, West Virginia
Counsel for Respondent Father

Patrick Morrisey, Esq.
Attorney General
Andrew T. Waight, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent West Virginia
Department of Health and Human
Resources

JUSTICE WOOTON delivered the Opinion of the Court.

JUSTICE BUNN did not participate in the decision of this case.

SYLLABUS BY THE COURT

1.     "'Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous.  A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.'  Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996)."  Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

2.     "'Where it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children [alleged] to be abused or neglected has been substantially disregarded or frustrated, the resulting order . . . will be vacated and the case remanded for compliance with that process and entry of an appropriate . . . order.'  Syllabus point 5, in part, *In re Edward B.*, 210 W.Va. 621, 558 S.E.2d 620 (2001)."  Syl. Pt. 3, *In re Emily G.*, 224 W. Va. 390, 686 S.E.2d 41 (2009).

i

3. "Each child in an abuse and neglect case is entitled to effective representation of counsel. To further that goal, [W. Va. Code § 49-4-601(f)] mandates that a child has a right to be represented by counsel in every stage of abuse and neglect proceedings. Furthermore, Rule [21.03] of the *West Virginia [Trial Court Rules]* provides that a guardian *ad litem* shall make a full and independent investigation of the facts involved in the proceeding, and shall make his or her recommendations known to the court. Rules 1.1 and 1.3 of the *West Virginia Rules of Professional Conduct*, respectively, require an attorney to provide competent representation to a client, and to act with reasonable diligence and promptness in representing a client. The Guidelines for Guardians *Ad Litem* in Abuse and Neglect cases, which are adopted in this opinion and attached as Appendix A, are in harmony with the applicable provisions of the *West Virginia Code*, the *West Virginia [Trial Court Rules]*, and the *West Virginia Rules of Professional Conduct*, and provide attorneys who serve as guardians *ad litem* with direction as to the duties in representing the best interests of the children for whom they are appointed." Syl. Pt. 5, *In re Jeffrey R.L.*, 190 W. Va. 24, 435 S.E.2d 162 (1993).

WOOTON, Justice:

In December 2019, the West Virginia Department of Health and Human Resources ("DHHR") filed an abuse and neglect petition alleging that minor children K.B.-R. and L.R.[1] may have been sexually abused by Respondent Father B.B. ("Respondent Father") after the children's mother, S.R., ("Petitioner Mother") discovered explicit videos of the children on L.R.'s, electronic device. The matter proceeded to adjudication in July 2020, at which time the circuit court heard testimony from multiple witnesses that the children made consistent disclosures of sexual abuse. During the adjudicatory hearing, the circuit court conducted in camera interviews of the children, then ages six and seven, during which the circuit court repeatedly accused L.R. of lying, brought her to tears, and concluded that K.B.-R. implicated Petitioner Mother in a "sinister plan" to falsify allegations against Respondent Father. The guardian ad litem (sometimes "guardian") for the children was present for this interview and failed to object to the circuit court's conduct. Ultimately, based in large part on the in camera interviews, the circuit court found the allegations against Respondent Father to be unsupported and dismissed the abuse and neglect petition. Petitioner Mother now appeals.

Upon review, this Court finds that the circuit court's conduct during the in camera interviews of the children violated the West Virginia Rules of Procedure for Child

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. See *In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015).

Abuse and Neglect Proceedings, the West Virginia Rules of Evidence, and this Court's precedent. Accordingly, we vacate the circuit court's order dismissing the underlying abuse and neglect petition, remand this matter for further proceedings consistent with this opinion, and further order that those proceedings take place before a different circuit judge.[2] Further, because we find that the guardian's representation of the children in this matter was deficient, we order that the new circuit judge appoint a new guardian ad litem.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At the outset, we note that the following factual recitation is formulated to provide context for the procedural errors we perceive to have occurred during the underlying proceedings. Nothing in this factual recitation is to be taken as this Court having opined on the merits of this matter in any way.

Petitioner Mother and Respondent Father are unmarried and have two biological children, L.R., and K.B.-R. Prior to the institution of the underlying abuse and neglect proceedings, they shared custody of their children. In November 2019 Petitioner Mother provided the eldest child, L.R., then seven years old, with a deactivated cellphone that she could use to play games and take photos and videos. Sometime thereafter the minor children spent the night at Respondent Father's house, and when they returned

---

[2] In the event the remaining judge in the Second Judicial Circuit is unable to preside in this matter, whether by disqualification or otherwise, this matter is to be transferred to a circuit judge in a manner consistent with the procedures for disqualification and temporary assignment of judges set forth in West Virginia Trial Court Rule 17.

Petitioner Mother observed L.R. deleting sexually explicit photos and videos of L.R. and K.B.-R. from the device. Petitioner Mother immediately took possession of the device and questioned L.R. as to the source of the photos. L.R. allegedly responded that Respondent Father "allowed" the children to take them.

Petitioner Mother immediately took the children and the device to the Moundsville Police Department to file a report regarding the sexually explicit material. In a statement, Petitioner Mother told Sgt. Brittany Earnest the children "told her that [Respondent Father] sleeps with them and touches them and himself." The statement also included specific instances of alleged sexual abuse disclosed to Petitioner Mother by the children, namely that Respondent Father inappropriately touched both children and digitally penetrated L.R..[3] Upon receipt of this report, the police set up an interview for the children, which was to be conducted at the Harmony House Child Advocacy Center ("CAC"). On December 4, 2019, the CAC interviewer, Lisa Musilli, separately interviewed the children, at which time the children made allegations of sexual abuse consistent with those in the police report.

On December 10, 2019, based upon the CAC interviews and the photo and videos recovered from L.R.'s electronic device, the DHHR filed an abuse and neglect

---

[3] We need not discuss the specific allegations, which were detailed and apparently consistently disclosed to multiple individuals over the course of the underlying proceedings, as we do not reach the merits of this case in resolving this appeal.

petition alleging that Respondent Father sexually abused the children.[4] There were no allegations against Petitioner Mother. Around this time, Petitioner Mother also sought the assistance of a personal therapist, Sarah Dean, for the children. In their sessions with Ms. Dean, the children again disclosed sexual abuse consistent with their prior reports to Ms. Musilli and to their mother.

In late December 2019, Respondent Father waived his preliminary hearing. He also moved for visitation with the children, but his motion was denied. After several delays, on July 7, 2020, the circuit court granted Respondent Father's renewed motion for supervised visits with the children.

Ultimately, on July 20, 2020, the parties appeared for an adjudicatory pre-hearing pursuant to Rule 24 of the Rules of Procedure for Child Abuse and Neglect Proceedings.[5] At that time the circuit court heard argument that Petitioner Mother caused one of the supervised visits with Respondent Father to be cancelled. Allegedly, Petitioner Mother contacted the visitation provider and "demanded" that the visit only occur at the

---

[4] The DHHR also alleged that Respondent Father had a history of Child Protective Services ("CPS") intervention due to unsanitary conditions in his home. In this regard, we observe that there is an extensive history of acrimony between Petitioner Mother and Respondent Father which resulted in the investigation of several dozen unsubstantiated allegations of abuse and neglect against Respondent Father prior to the institution of the instant proceedings.

[5] Rule 24 provides for an "adjudicatory prehearing conference" prior to the final adjudicatory hearing and, inter alia, sets forth certain specific subjects that can be discussed at this conference.

DHHR's offices, and that such visit be recorded. Petitioner Mother denied making a demand, arguing that she simply asked if those conditions could be met. During the hearing the circuit court attempted to call the visitation provider but could not reach him as he was out of town at the time of the hearing. However, the court was able to contact the provider's supervisor who, after being placed under oath, read into the record an email from the provider that suggested Petitioner Mother made the aforementioned demand. At this point the court asked Petitioner Mother if she wished to alter her testimony, and she declined to do so. The court then called Petitioner Mother an "absolute liar" and had her handcuffed under the guise of holding her in contempt of court. At that time the court further indicated that it might remove the children from Petitioner Mother's custody and place them with the *paternal* grandmother, with whom the allegedly abusive Respondent Father resided. Ultimately the court neither pursued a contempt charge against Petitioner Mother, nor disturbed the children's placement.

Thereafter, the circuit court held a two-day adjudicatory hearing, conducted on July 28, 2020, and August 18, 2020. Over the course of this hearing, the court heard testimony from multiple individuals, including Det. William Whitelatch with the Moundsville Police Department; DHHR supervisor Taunia VanCamp; DHHR Worker Toni Nething; the CAC interviewer, Ms. Musilli; the children's personal therapist, Ms. Dean; an expert witness qualified in "trauma informed care," Shelle Bernstein Goff; and Petitioner Mother. The court also conducted in camera interviews of L.R. and K.B.-R.,

then ages six and seven, during which the children's guardian ad litem and the court reporter were also present.

As previously mentioned *supra* in note 3, we do not resolve the merits of this action; we only address the conduct of the individuals present during the children's in camera testimony. In this regard, even though we provide portions of the children's testimony, our analysis hinges not on the substance of the children's testimony, but on the conduct of the persons present for their testimony.

During L.R.'s interview the child was easily distracted and, at various times, hid under the table in the circuit judge's chambers. Moreover, from the outset, the child indicated that she did not want to discuss the allegations of sexual abuse. Despite this, when asked whether she had been touched inappropriately, L.R. repeated, in consistent detail, the allegations previously disclosed to CAC and to her personal therapist that Respondent Father allegedly digitally penetrated her anus. The circuit court did not address that allegation in any detail at that time but returned to it later in the interview. Instead, the court asked L.R. about the sexually explicit photos and videos found on her electronic device, which resulted in the following exchange:

> The court: Yeah? Okay. How did you get a cell phone?
>
> L.R.: I wanted one very badly, and mom said – and mom had an extra one from [], my old uncle.
>
> The court: Yeah.

6

L.R.: And nobody used it, so she handed it to me, and [Respondent Father] told me to take that video.

The court: That was quite a jump. So as soon as mommy handed it to you, [Respondent Father] told you to take a video?

L.R.: No, when I went there the first time.

The court: Oh. I think you're lying. You know that. You know I think you're lying.

L.R.: I'm not.

The court: Yeah, I think you are.

L.R.: I'm not.

The court: Yeah. You jumped to that pretty quick, didn't you? You offered it really quick.

L.R.: I'm not lying. I'm not lying.

The court: You always get what you want, don't you?

L.R.: (Shakes head in the negative)

The court: How come, when I asked you about the cell phone, all the sudden you say, "Mommy gave it to me," and then the very next thing you say is, "[Respondent Father] told me to take the videos"?

L.R.: Because I didn't know that you were talking about that now. I thought you wanted me to say that.

The court: You thought I wanted you to say that?

L.R.: Uh-huh.


At that point, L.R. began to cry and the circuit court, while vaguely attempting to calm her down, continued to question her. Over the next several minutes, while still distressed, the child reiterated that Respondent Father told her to take the videos,

7

and that no one directed her to testify as such. L.R. then repeated the allegation that Respondent Father digitally penetrated her and disclosed that Respondent Father made her touch his penis, at which time the court repeatedly implied that the child was lying, culminating in this exchange:

> The court: So you don't have to like [Respondent Father]. Okay? I'm not here to talk—not here to make you like [him] at all, but what I am here for is the truth. Okay?
>
> L.R.: Uh-huh.
>
> The court: And the truth, that I see it, is [he] never stuck his finger where you said he did.
>
> L.R.: But he did.
>
> The court: And you never touched his penis.
>
> L.R.: I didn't like it.
>
> The court: And you never touched his penis.
>
> L.R.: I did.
>
> The court: Can we agree that one of those is not true?
>
> L.R.: They both are.
>
> The court: Okay. What else is true?
>
> L.R.: (Crying)

At no point during this interview did the guardian for the child object to the manner of questioning, and, in fact, asked questions of his own at the end of the interview.

The circuit court next interviewed six-year-old K.B.-R, who displayed similar signs of discomfort throughout the interview. After repeating the same allegations

8

of sexual abuse she disclosed to other individuals, K.B.-R. hid under the table in the judge's chambers.  While the child was under the table, the following exchange occurred:

The court:  Who's there?  Get up here.  We're almost done, dear.  Okay?  Can you tell me why we're here today?

K.B.-R.:  To get rid of him.

The court:  To get rid of who?

K.B.-R.:  [Respondent Father].

The court:  What are we going to do about him?  What's our plan?

K.B.-R.:  Put him in jail.

The court:  Are we?

K.B.-R.:  (Shakes head in the affirmative)

The court:  Who said that?  That's the plan, isn't it?

K.B.-R.:  (Shakes head in the affirmative)

The court:  It is?

K.B.-R.:  Uh-huh.

The court:  It's the plan to put [Respondent Father] in jail, right?

K.B.-R.:  Uh-huh.

The court:  Is that a yes?

K.B.-R.:  Uh-huh.

. . . .

The court:  So what's the plan?  I'll write it down or she'll type it.  What's the plan?

K.B.-R.:  To put him in jail.

9

The court:    Okay.  Who's going to do that?

K.B.-R.:    The police.

The court:    How come?  Why are the police going to do that?

K.B.-R.:    Because that's the plan.

The court:    Whose—who knows about the plan?

K.B.-R.:    Mom.  Our mom, our dad.

The court:    Who's dad?

K.B.-R.:    [Petitioner Mother's boyfriend].

The court:    [Petitioner Mother's boyfriend]?  Okay.  Who else knows about the plan?

K.B.-R.    Nobody else.

The court:    Huh.  This is pretty close—this is pretty secret, isn't it?

K.B.-R.:    Uh-huh.

The court:    Now you know about it, right?

K.B.-R.:    Uh-huh.  And [L.R.] does.

The court:    Okay.  Who else knows about the plan?

K.B.-R.    The only last person is you.

The court:    Okay, plan.  Who came up with this plan?

K.B.-R.:    My mom.

The court:    And what did she tell you about the plan?  How's this plan going to work?  Did she tell you how it's going to work?

K.B.-R.:    Huh-uh.

10

The court: So did—are there certain things we've got to do or say?

K.B.-R.: No.

The court: We're just going to say things about [Respondent Father]?

K.B.-R.: Uh-huh.

The court: Like bad things?

K.B.-R.: Uh-huh. That he did. Yeah.

. . . .

The court: Okay. So what—what do you have to do for the plan to work?

K.B.-R.: We got to tell the police that.

The court: Tell the police what?

K.B.-R.: That I told you so you can tell them.

The court: Huh. And what—what exactly were you told to say?

K.B.-R.: Nothing.

The court: That he touched you?

K.B.-R.: (Shakes head in the affirmative)

The court: That's the plan, right?

K.B.-R.: Uh-huh.

The court: And mommy came up with this plan?

K.B.-R.: Uh-huh.

The court: She's really smart, isn't she?

K.B.-R.: Uh-huh.

11

After the conclusion of the interviews, the circuit court returned to the open adjudicatory hearing and heard additional testimony from other witnesses. Thereafter, the circuit court entered an order dismissing the abuse and neglect petition, finding that the DHHR had not met its burden of establishing by clear and convincing evidence that Respondent Father had abused the children. Petitioner Mother appealed to this Court and, upon determining that the order contained no findings of fact, we remanded for entry of a more detailed order. *See In re K.B.-R. and L.R.*, No. 20-0734, 2021 WL 983076 (W. Va. Mar. 16, 2021) (memorandum decision).

On April 7, 2021, the circuit court entered a corrected order that set out detailed findings. Among other things, the circuit court found, in relevant part, that

> there is substantial circumstantial evidence of parental coaching or encouragement of the allegations of this case by [Petitioner Mother]. Specifically, during the in-camera interview of [K.B.-R.], this child gave a very detailed description of what this [c]ourt views as a sinister plan developed by [Petitioner Mother] to send the Respondent Father [B.B.] to jail in efforts of thwarting Respondent father's relationship with his children and to permit [Petitioner Mother's] current fiancé to assume the role of father to those children.

> The [c]ourt finds it troubling that the children have called their mother's boyfriend their father. When this minor child was asked during her in-camera interview by the [c]ourt why she was in [c]ourt, the child indicated and responded, "To get rid of him." The child further indicated that the plan was to put Respondent father in jail. This child indicated that they were in court to say bad things about the Respondent father and that he did bad stuff to them.

12

Most problematic during questioning, the minor child was asked specifically if she was told to say that the Respondent father had touched her inappropriately to which the child responded in the affirmative. The child further informed the [c]ourt that her "mommy" had come up with this plan. This [c]ourt finds that this evidence is highly suspect and unconvincing and that the minor child was likely coached by her mother and that her mother was pursuing a course of action to separate the Respondent father from the children.

Petitioner Mother now appeals this order alleging that this, and several other findings of fact, are not supported by the record, that the circuit court's conduct during the children's in camera interviews was inappropriate, and that the guardian's representation was deficient.

## II. STANDARD OF REVIEW

Our standard of review in abuse and neglect cases is as follows:

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such a child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). With this standard in mind, we now proceed to address the parties' arguments on appeal.

## III. ANALYSIS

On appeal, we need only address Petitioner Mother's assignments of error in regard to the manner in which the circuit court conducted the in camera interviews, and the deficient representation of the children by the guardian, as these two issues are dispositive of this case.[6]

Our resolution of this matter is strictly procedural and not based on the merits. Thus, our decision does not encompass any examination or determination as to whether the evidence supports a determination that the children were or were not abused. With that in mind, we examine the procedural flaws that occurred in the proceedings below.

### A. *Conduct During the In Camera Interviews*

Our review begins with the in camera interviews, which we find violated not only our Rules of Procedure for Child Abuse and Neglect Proceedings, but also the Rules of Evidence. First, Rule 8 of the West Virginia Rules of Procedure for Child Abuse and

---

[6] Because we afford relief on these two assigned errors, we need not address Petitioner Mother's remaining assignments of error, which include: 1) the circuit court's factual findings are clearly erroneous; 2) the circuit court erred in reinstating a prior parenting plan without undertaking a "best interests" analysis; and 3) the DHHR failed to perform a comprehensive and independent investigation into the allegations of abuse.

Neglect Proceedings, which governs the taking of children's testimony, provides in relevant part:

> (a) *Restrictions on the testimony of children.* — Notwithstanding any limitation on the ability to testify imposed by this rule, all children remain competent to testify in any proceeding before the court as determined by the Rules of Evidence and the Rules of Civil Procedure. *However, there shall be a rebuttable presumption that the potential psychological harm to the child outweighs the necessity of the child's testimony* and the court shall exclude this testimony if the potential psychological harm to the child outweighs the necessity of the child's testimony. Further, the court may exclude the child's testimony if (A) the equivalent evidence can be procured through other reasonable efforts; (B) the child's testimony is not more probative on the issue than the other forms of evidence presented; and (C) the general purposes of these rules and the interest of justice will best be served by the exclusion of the child's testimony.

*Id*. (emphasis added). By its plain language this rule presumes that the act of testifying may be psychologically harmful to children and imposes constraints and conditions as guidance for the court in determining whether to permit a child to testify. As a preliminary matter, it is not at all clear that it was necessary to interview K.B.-R. and L.R in order to fully develop the record in this case. The children made consistent disclosures of sexual abuse to no less than three witnesses whose testimony was also before the circuit court. Moreover, the record below contained video recordings of the children's interviews with CAC which included substantially the same information the circuit court attempted to glean from the in camera interviews. Despite the apparent lack of necessity for the in camera interviews here, we will presume for the purposes of our analysis that the court was properly within its discretion to conduct the interviews.

15

Second, the circuit court's method of questioning the child L.R. plainly violated Rule 611 of the West Virginia Rules of Evidence. Rule 611(a)(3) provides, in relevant part: "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: . . . *protect witnesses from harassment or undue embarrassment. Id.* (emphasis added). In regard to L.R., not only did it fail to protect L.R. from harassment, the court *perpetrated* the harassment insofar as it repeatedly accused her of lying and left her in tears. Even assuming, arguendo, that L.R.'s bursting into tears was an acceptable risk in taking the child's testimony, we cannot conceive of any reasonable method or purpose of questioning a child which involves openly and directly accusing the child of lying.

From our review of the in camera hearing transcript, we find that the manner in which the circuit court conducted the interviews of the children violated the protection from psychological harm afforded by Rule 8.[7] Beginning with the interview of seven-year-old L.R., a cursory review of the transcript indicates that the child was distressed from the outset. She openly expressed her desire to leave the room and to go home, she was initially hesitant to discuss the sexual abuse allegations, and she at various points wandered around the room and hid under a table. Despite this, the circuit court proceeded with questioning

_____

[7] This Court has not — and will not — set explicit guidelines for conducting in camera interviews, as the rules generally afford the circuit court discretion in the manner of taking the child's testimony, as long as the circuit court complies with the West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure. The learned judges of this state are well-suited to interview children in a manner which comports with their professional, ethical, and legal obligations.

16

the child, apparently to some success as L.R. began to answer the questions posed to her. However, the interview took a decidedly downward turn when the court asked L.R. about the explicit material on her electronic device. At that point, the court repeatedly accused the child of lying when she explained that Respondent father told her to take the photos and videos. The court was so persistent in this endeavor that L.R. began to cry. While the court attempted to calm her, it continued to question her despite her emotional response. Ultimately, the interview culminated in another exchange during which the court told the child she was lying after she described the instances of inappropriate touching, leaving the child in tears. Again, the specific purpose of Rule 8 of the Rules of Procedure for Child Abuse and Neglect Proceedings is to protect the child from the psychologically harmful effects of testifying. From the record, it is apparent that this interview approached — and may have transgressed — the bounds of psychological harm to L.R. Accordingly, we conclude that the court violated Rule 8 and, therefore, erred in the manner in which it conducted L.R.'s in camera interview.

With respect to the interview of six-year-old K.B.-R., who was not brought to tears but did exhibit initial signs of distress comparable to those exhibited by L.R., it is noteworthy that she was easily distracted, hid under the table, and expressed a desire to leave. Despite the more subdued nature of this interview, we are concerned that the circuit court may have coerced the child into implicating Petitioner Mother in a "sinister plan" to

17

fabricate allegations against Respondent Father.[8]  Upon review, we find that the court's

manner of questioning K.B.-R. also violated Rule 8 and, therefore, constituted error.

Rule 611(c) of the West Virginia Rules of Evidence provides in relevant part,

that "[l]eading questions should not be used on direct examination except as necessary to

develop the witness's testimony."  Unquestionably, a court may ask a child leading

questions during an in camera interview when appropriate.  We have addressed Rule 611(c)

in the context of child witnesses in *State v. Cottingham*, finding that a circuit court did not

err in leading a child who "was very reticent to testify, [] had to be repeatedly asked to

speak up, and [] often would not give an answer unless prompted to do so."  No. 13-1211,

2014 WL 5545930 (W. Va. Nov. 3, 2014) (memorandum decision).

An examination of the transcript of the in camera interview of K.B.-R.

reveals that the factors we considered in *Cottingham* were not present here.  Specifically,

unlike the thirteen-year-old witness in that case, six-year-old K.B.-R. freely answered the

---

[8] Again, we do not address whether such a plan actually existed, but with the prospect that the circuit court's method of questioning coerced the child into agreeing that a plan existed, simply to confirm the court's stated suspicions in that regard.  A full review of the child's testimony reveals that there was never a mention of any "plan" until the court first used those words by asking K.B.-R., "What are we going to do about [Respondent Father]?  What's our plan?"  Thereafter, the circuit court repeatedly used the word "plan" in its questions, progressively tailoring questions to lead the child to confirm that the plan was "secret" — yet another word only used by the court — and that Petitioner Mother had concocted a scheme to "say bad things" about Respondent Father to the police and to the court.  The court then used that testimony to find in its order that the children had been subject to parental coaching.

circuit court's questions, albeit in a manner typical of young children (e.g., "uh-huh" and "huh-uh" unless the question required a more elaborate answer). While she was subject to some prompting, overall, she was forthcoming in describing the allegations of abuse. Moreover, despite the court's myriad questions essentially asking if the child had been coached, K.B.-R. consistently testified that she was not instructed to say certain things or testify in a particular manner. We believe the circuit court may have suspected that the children had been subject to coaching, and thus used the interview of K.B.-R. to confirm that suspicion. While we do not fault the court for attempting to ascertain whether those suspicions were well-founded, the manner in which the court used leading questions violated both the law enunciated by the Court in *Cottingham* and the Rules of Evidence. Consequently, we find that the court erred in asking K.B.-R. leading questions that cause a reviewer to question whether they were calculated to confirm a pre-existing suspicion rather than elicit truthful testimony.

In sum, we conclude that the circuit court erred in the manner in which it conducted the in camera interviews of L.R. and K.B.-R. While it is not unique that both children were distressed at such a time, during the conduct of in camera interviews the court must remain vigilant as to the vulnerability of interviewees — especially young children. To accuse a seven-year-old child of lying, thereby reducing that child to tears, and to strongly suggest — if not coerce — an even younger child to implicate a parent in a plot to fabricate allegations of abuse, is inconsistent with the court's role as an impartial

factfinder. This is both a violation of the Rules of Evidence and the Rules of Procedure for Child Abuse and Neglect Proceedings. In this regard, we have held that

> "[w]here it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children [alleged] to be abused or neglected has been substantially disregarded or frustrated, the resulting order . . . will be vacated and the case remanded for compliance with that process and entry of an appropriate . . . order." Syllabus point 5, in part, *In re Edward B*., 210 W.Va. 621, 558 S.E.2d 620 (2001).

Syl. Pt. 3, *In re Emily G.*, 224 W. Va. 390, 686 S.E.2d 41 (2009). Accordingly, because the procedures established by the relevant rules have been substantially disregarded and frustrated, we vacate the circuit court's order dismissing the abuse and neglect petition and remand this matter for further proceedings consistent with this opinion. Further, we direct that, upon remand, this matter be assigned to a different circuit judge who is to undertake an appropriate, independent review in resolving this case.

### B. *Deficiencies of the Guardian ad Litem*

Petitioner Mother also argues that the guardian ad litem's representation of the children in this matter was deficient because: (1) the guardian failed to file a report prior to the adjudicatory hearing; and (2) the guardian failed to meet with the children throughout the underlying proceedings. At the outset, we note that Petitioner Mother's first argument is without merit as the guardian was under no obligation to file a report prior the adjudicatory hearing. Rather, Rule 18a of the Rules of Procedure for Child Abuse and Neglect Proceedings directs that a guardian must file a report five days before a

dispositional hearing.  This matter never reached disposition, so a report was not required.

Nevertheless, we do find the guardian's representation of the children was inadequate for

the reasons discussed *infra*.

Petitioner Mother contends that the guardian failed to meet with the children

consistently throughout the underlying proceedings.  In fact, Petitioner Mother argues in

her brief that the guardian met with the children only once, roughly six months into the

proceedings, and did not ask the children about the sexual abuse allegations at that time.

In his response, the guardian concedes this fact.  We also note that the guardian met with

the children at least once more — on February 7, 2022, as indicated in the guardian's Rule

11(j) status update filed with this Court.

This Court has long held that

> [e]ach child in an abuse and neglect case is entitled to
> effective representation of counsel.  To further that goal, [W.
> Va. Code § 49-4-601(f)] mandates that a child has a right to be
> represented by counsel in every stage of abuse and neglect
> proceedings. Furthermore, Rule [21.03] of the *West Virginia
> [Trial Court Rules]* provides that a guardian *ad litem* shall
> make a full and independent investigation of the facts involved
> in the proceeding, and shall make his or her recommendations
> known to the court.  Rules 1.1 and 1.3 of the *West Virginia
> Rules of Professional Conduct*, respectively, require an
> attorney to provide competent representation to a client, and to
> act with reasonable diligence and promptness in representing a
> client.  The Guidelines for Guardians *Ad Litem* in Abuse and
> Neglect cases, which are adopted in this opinion and attached
> as Appendix A, are in harmony with the applicable provisions
> of the *West Virginia Code*, the *West Virginia [Trial Court
> Rules]*, and the *West Virginia Rules of Professional Conduct*,

21

and provide attorneys who serve as guardians *ad litem* with direction as to the duties in representing the best interests of the children for whom they are appointed.

Syl. Pt. 5, *In re Jeffery R.L.*, 190 W. Va. 24, 435 S.E.2d 162 (1993); *see also* W. Va. Code § 49-4-601(f)(1) (Supp. 2021) ("In any proceeding under this article, the child shall have counsel to represent his or her interests at all stages of the proceedings."). In this regard, we recently stated that "we question whether a guardian can effectively and competently represent their child wards when they do not maintain contact with them throughout the proceedings, if for no other reason than to ascertain whether they are safe and well." *In re B.C., S.C., and T.C.*, Nos. 20-0979 and 20-0994, 2021 WL 5216715, *4 n.6 (W. Va. Nov. 9, 2021) (memorandum decision). While we declined to address the conduct of the guardian in *B.C.* who met with the children only once, we can no longer ignore what we believe is becoming a troubling pattern. Lest there be any confusion going forward, let us be clear: in effectively representing a child, it is imperative that a guardian maintain contact with the child throughout the proceedings, just as they would any other client. Doing so is necessary, at a minimum, to understand what is in that child's best interests and what the guardian must do to effectively advocate for those interests.

This requirement is not new. In fact, Rule 18a(b) of the Rules of Procedure for Child Abuse and Neglect Proceedings refers guardians to Appendix A – Guidelines for Children's Guardians *Ad Litem* in Child Abuse and Neglect Cases (hereinafter "Appendix A") for a thorough explanation of their duties as guardians ad litem. Specifically, Appendix A requires not only that the guardian schedule an initial in-person meeting with

22

the child, but also that the guardian "[m]aintain contact with the child throughout the case to monitor whether the child is receiving counseling, tutoring, or any other services needed to provide as much support as possible under the circumstances." App. A(C)(7); *see also* App. A(C)(6)(a) (directing the guardian to conduct in-home visits, when appropriate, to observe the living environment and the child's interactions with parents or caretakers).

Guardians ad litem are integral to the functioning of our court system, and we greatly commend them for representing our state's most vulnerable individuals — our children — particularly in abuse and neglect actions. We further recognize that matters such as these involve extensive time and energy commitments, and that many guardians represent multiple child wards at a time. However, the legal and ethical obligations involved in representing a client do not lessen simply because that client is a child or because the attorney has additional clients to whom they must attend. Children are entitled — by statute, by court rules, and by the holdings of this Court — to effective legal representation. *See* App. A(B)(1) ("The Rules of Professional Conduct apply to a GAL's representation of a child in an abuse and neglect proceeding."); *see also* W. Va. R. Pro. Conduct 1.1 and 1.3 (requiring an attorney to provide competent representation to a client, and to act with reasonable diligence and promptness in representing a client.). While there may be certain limited exceptions, we are firmly of the opinion that failure to maintain contact with a child ward throughout the proceedings is an abdication of a guardian ad litem's legal and ethical responsibilities to that child and constitutes inadequate representation. As the guardian in this case failed to maintain contact with these children

23

— other than the single meeting before the adjudicatory hearing and the single meeting for purposes of updating this Court on the children's status — his representation of these children was deficient.

Our analysis does not end there. We are also concerned that the guardian was present during the in camera interviews of the children discussed extensively above, yet, at no point did he object to the circuit court's conduct or questioning of the children. Further, despite their distress — apparent to this Court even through a cold record — the guardian made no effort to pause or terminate the interviews, soothe the children, or in any way protect or advocate for the children's interests as their attorney should have. In fact, despite L.R.'s apparent emotional state at the end of her interview, the guardian proceeded to ask her several questions of his own.

Appendix A of the Rules of Procedure for Child Abuse and Neglect Proceedings explains that guardians must

> [a]ssess whether it is appropriate for the child to participate in court hearings or multi-disciplinary team meetings. The [guardian] is to participate in any discussions regarding the proposed testimony of the child and, if it is determined that the child's testimony is necessary, strongly advocate for the testimony to be taken in *an acceptable and emotionally neutral setting*.

App. A(D)(4) (emphasis added). As set forth above, there was nothing emotionally neutral about the setting in which the children's testimony was taken in this case, and it is

24

abundantly clear from the record that the guardian did nothing throughout the interviews to advocate for the children in this regard. That is a dereliction of the guardian's duties.

When asked about this at oral argument, the guardian responded that he believed the circuit court's conduct was appropriate during the children's respective in camera interviews. We strongly disagree and find it troubling that the children's legal counsel would sanction behavior that was not only apparently traumatizing, but was in clear violation of this Court's precedents, the Rules of Procedure for Child Abuse and Neglect Proceedings, and the Rules of Evidence.

For these reasons, we find that the guardian ad litem's representation of the children in this matter was deficient. In hopes of averting comparable procedural difficulties going forward, we direct that the new circuit judge appoint a new guardian ad litem to represent the children.

## IV. CONCLUSION

For the foregoing reasons, we vacate the Circuit Court of Marshall County's April 7, 2021, Order and remand this matter for further proceedings consistent with this opinion. We further order that, upon remand, this matter be assigned to a different circuit court judge and that the new circuit judge appoint a new guardian ad litem to represent the children.

Vacated and remanded with directions.