IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**FILED**

**March 26, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

January 2025 Term

No. 23-339

IN RE K.V.

Appeal from the Circuit Court of Kanawha County
The Honorable Jennifer F. Bailey, Circuit Judge
Civil Action No. 20-JA-667

VACATED AND REMANDED

Submitted: January 14, 2025
Filed: March 26, 2025

Edward L. Bullman, Esq.
Bullman and Bullman
Charleston, West Virginia
Counsel for Petitioner

John B. McCuskey, Esq.
Attorney General
Michael R. Williams, Esq.
Solicitor General
Office of the Attorney General
Charleston, West Virginia
Counsel for Respondent

Matthew Smith, Esq.
Campbell and Smith
Charleston, West Virginia
Guardian ad Litem

JUSTICE WALKER delivered the Opinion of the Court.

JUSTICE ARMSTEAD dissents and reserve the right to file a separate opinion.

SYLLABUS BY THE COURT

1.      "'When this Court reviews challenges to the findings and conclusions of the circuit court, a two-prong deferential standard of review is applied.  We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.' Syl. [Pt. 1], *McCormick v. Allstate Ins. Co.*, 197 W. Va. 415, 475 S.E.2d 507 (1996)." Syllabus Point 1, *In re S. W.*, 236 W. Va. 309, 779 S.E.2d 577 (2015).

2.      "The standard of proof required to support a court order limiting or terminating parental rights to the custody of minor children is clear, cogent and convincing proof." Syllabus Point 6, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973).

3.      "Even when an improvement period is granted, the burden of proof in a child neglect or abuse case does not shift from the [DHS] to the parent, guardian or custodian of the child.  It remains upon the [DHS] throughout the proceedings." Syllabus Point 2, *In re S. C.*, 168 W. Va. 366, 284 S.E.2d 867 (1981).

4.      "'Where it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children adjudicated to be abused or neglected has been substantially disregarded or frustrated, the resulting order of disposition will be vacated and the case remanded for compliance with that process and entry of an appropriate

i

dispositional order.' Syl. Pt. 5, *In re Edward B.*, 210 W. Va. 621, 558 S.E.2d 620 (2001)."

Syllabus Point 8, *In re K.S.*, 246 W. Va. 517, 874 S.E.2d 319 (2022).

WALKER, Justice:

Petitioner mother C.V.[1] appeals the termination of her parental rights, contending that the bases for termination were instances of "noncompliance" that were known to the Department of Human Services (DHS) throughout the proceedings but were not raised as grounds for termination until disposition. Specifically, Petitioner was directed to participate in mental health counseling and was provided with a referral consistent with the services offered to her, but she refused counseling. And, there were two isolated incidents where Petitioner was improperly in contact with the child. Even after those events, DHS advised the court at various hearings that Petitioner was fully compliant and doing well with her improvement period. Petitioner underwent a psychological evaluation and received a "poor" prognosis for improved parenting and was given recommendations to seek intensive psychotherapy and a consultation for medication management of her mental health issues. Immediately following receipt of that report, DHS abandoned its previous position that Petitioner's improvement period should continue and sought termination of her parental rights for the failure to seek mental health treatment and for the visitation violations. Then, the circuit court terminated Petitioner's parental rights for failure to seek mental health treatment, finding that her parental rights had previously been terminated to other children and she had not met her burden of proof. Without passing

---

[1] Consistent with our practice in cases involving sensitive facts, we identify the parties by initials only. *See In re Jeffrey R.L.*, 190 W. Va. 24, 26 n.1, 435 S.E.2d 162, 164 n.1 (1993).

judgment on the propriety of termination of parental rights on this fact pattern, we vacate the dispositional order and remand for a new dispositional hearing because the circuit court impermissibly shifted the burden of proof onto Petitioner.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Petitioner's parental rights to seven children were terminated in 2014. Neither the factual nor legal bases for the prior terminations is clear from the record but domestic violence and "mental issues" are referenced. K.V. was born in December of 2020 and DHS filed a petition in January 2021 on the basis of the prior terminations.[2] Petitioner moved for, was granted, and successfully completed a pre-adjudicatory improvement period. At the conclusion of that improvement period, K.V. was gradually returned to her custody in October 2021. After the circuit court agreed to dismiss the case but before the order was entered, Petitioner was involved in a domestic dispute involving the child's father in December 2021. Petitioner was intoxicated at the time and hit the child's father. A neighbor called law enforcement and informed them that Petitioner was the aggressor. Petitioner became combative with police while she was holding the child, and the child was injured on an elevator door frame. Petitioner was arrested and charged with battery

---

[2] As Petitioner's parental rights were not terminated in the underlying case for failing to correct the same conditions that gave rise to the prior terminations and because the circuit court and the parties agreed that the prior terminations were not a basis for the filing of the later-filed amended petition, we need not examine the bases for those prior terminations in this case. *See* discussion, *infra*.

on an officer, obstruction, and child abuse with risk of injury.[3]  DHS filed an amended petition on December 22, 2021, based on the incident.

The circuit court held a preliminary hearing on January 14, 2022, during which Petitioner's counsel objected to the posture of the case as an amended filing. Petitioner argued that because the initial petition, which was based on prior terminations, had been dismissed, the matter was no longer a presumptive termination case.  The circuit court's order from that hearing reflects that "[t]he State agrees it would be inappropriate to raise any prior actions of the Respondent mother in the re-opened proceeding."  The preliminary hearing was continued due to connectivity issues, but Petitioner later waived her right to a contested preliminary hearing.  Following that waiver, the circuit court ordered that after three negative drug screens, Petitioner could visit with the child and ordered that she be provided with services pending adjudication, specifically adult life skills, drug screens, and parenting classes.

At the February 23, 2022, adjudicatory hearing, Petitioner stipulated to adjudication for alcohol use and domestic violence in the presence of the child and simultaneously moved for a post-adjudicatory improvement period.  The court took that motion under advisement given that Petitioner had been making unauthorized contact with the child at the kinship placement.  The court cautioned Petitioner that all contact with the

---

[3] The record does not contain information relating to the status of those charges, but Petitioner's counsel stated in proceedings below that they "didn't go anywhere."

child should be in a supervised capacity, and that further unauthorized contact could adversely affect her parental rights. Petitioner was offered continued services through Liam's Place while that motion was pending. The court summary prepared in anticipation of the hearing lists the services offered through Liam's Place as individualized parenting and adult life skills, drug screening, help with Alcoholics Anonymous participation, and contact information for a family abuse program and domestic violence counseling.

A court summary prepared for an April 6, 2022, hearing notes that Petitioner's drug screens were consistently negative and included the treatment notes from Liam's Place. Those treatment notes state that Petitioner was referred for adult life skills, individualized parenting classes, drug testing, and domestic violence treatment. However, the treatment goals outlined by DHS and the Multi-disciplinary Team (MDT) as terms and conditions of her improvement period include "client will seek psychiatric counseling for mental health issues" and indicate that Liam's Place referred Petitioner to West Virginia University Behavioral Medicine and Psychiatry and to Lasting Solutions, an outpatient therapy service. The treatment notes also state that Petitioner refused to seek therapy or counseling, and recommend that she be required to participate in therapy concerning her mental health status every other week, if not weekly. DHS recommended only that Petitioner's dispositional hearing be continued due to a change in caseworkers.

The parties appeared for a dispositional hearing on May 17, 2022, but that transcript is not included in the appendix record. The court summary reflects that Petitioner

4

was complying with services and had consistently negative drug screens, and that the parties had agreed on a post-adjudicatory improvement period for Petitioner. By order dated June 22, 2022, the court granted Petitioner's motion for an improvement period "under the terms and conditions contained in her written motion and agreed to by the MDT."[4]

The parties appeared on June 30, 2022, and the court was updated "as to the [Petitioner's] participation in the improvement period" and was advised that she was compliant with services and doing well, with DHS recommending that her improvement period continue consistent with the court summary. The provider notes from Liam's Place provided to the court in anticipation of that hearing indicate, in relevant part, that the court had not ordered a psychological evaluation, and that Petitioner was compliant with services and passing drug screens.

The parties appeared again for a review hearing on August 9, 2022. The summary provided to the court reflects that the Liam's Place provider saw Petitioner at an event with the child and inquired why Petitioner was having unauthorized contact. Petitioner responded that she had taken the child from the placement upon seeing the child at the event in a dirty stroller. The summary states that the child was moved to a different placement and that the MDT discussed the incident. It further recommends that her

---

[4] Petitioner's written motion for an improvement period did not contain any terms, but rather stated she was willing to comply with any services or terms imposed by the court.

improvement period continue. However, the case plan filed with the court recommends that Petitioner's parental rights be terminated, listing as the basis for termination as "7 previous terminations." The portion of the family case plan related to Petitioner's mental health, including diagnoses, conditions affecting ability to parent, and recommended evaluation was blank.

The court noted its acceptance of both documents, but neither DHS nor the Guardian ad Litem brought the visitation violations to the court's attention during the hearing. The Liam's Place worker stated that Petitioner was compliant with services and had been testing negative. As to her participation in her improvement period, the court's order likewise states that Petitioner was compliant with services and doing well. The court further authorized the MDT and the Guardian ad Litem to approve increased visitation and Petitioner's counsel asked that they look toward reunification. There was no objection by DHS or the Guardian ad Litem, but the record is not clear whether that was directed at increased visitation or the prospect of reunification.

Visitation notes dated September 1 and September 7, 2022, reflect that visits were going well. Specifically, the notes state that Petitioner brought all necessary items for the visits, was loving, affectionate, attentive, and communicated well with the child, and that the two appeared to be securely attached. The worker noted no concerns. The notes from the September 14, 2022, visit reflect similar attention and attachment, but when leaving the center, Petitioner was instructed not to bring toys and clothes to every visit. At

6

that point, she did not understand the difference between providing necessary items versus providing gifts, became "belligerent," and was removed from the center. At the next visit on September 21, 2022, Petitioner did not bring presents as requested, and the visit went well; the notes again reflect that Petitioner was loving, attentive, and that the two were securely attached. The visit on September 28, 2022 contains similar notes.[5]

Petitioner underwent a psychological evaluation on September 9, 2022, which results were reported on September 29, 2022. The psychological evaluation noted a "poor" prognosis for the reliable future attainment of minimally adequate parenting, based in part on Petitioner's refusal to answer questions about the children to whom she no longer had parental rights. The evaluation recommended, among other things, that Petitioner seek psychiatric consultation for medication management of mood disturbance symptoms consistent with the evaluator's "provisional diagnosis" of mixed personality traits, an unspecified anxiety disorder, and to rule out unspecified bipolar disorder.

The parties came before the court for another status hearing on October 12, 2022. The court summary prepared in anticipation of that hearing states that DHS recommends that Petitioner's improvement period be terminated "due to her violating the

---

[5] The provider note for the September 28, 2022 visit states that the foster mother asked the provider if Petitioner was "high," and the provider reminded the foster mother that the providers would step in if they suspected she was under the influence. Since the notes do not reflect anything other than that the foster mother suggested Petitioner might be under the influence, we assume that the providers disagreed with the foster mother's assessment.

7

visitation rules and her poor prognosis on her psychological evaluation." The "status/services" section was then amended to include (1) Petitioner's "violations of court orders and visitation stipulations" by taking the child from the original placement in July of 2022, (2) a summary of the findings of the psychological evaluation, including indications of poorly controlled mental health concerns, and (3) Petitioner's history of CPS intervention and visitation violations as indicative that she does not benefit from services.

At the hearing, DHS requested to move forward with disposition. Petitioner did not object, provided services would continue to be offered, but contended that the "visitation violations" complained of in the October report to the court were known to DHS previously and had not presented an issue. The dispositional hearing was scheduled for December 14, 2022. The court summary provided in anticipation of that hearing notes that Petitioner had concerns about the child's health and had been trying to locate the foster placement. It further notes that the caseworkers recommended she participate in psychiatric services and declined. Attached provider notes reflect that while Petitioner was compliant with services, she made little to no progress. The dispositional hearing was continued and ultimately held in January of 2023.

In the interim, Petitioner tested positive for codeine on a single occasion. When providers asked if she had a prescription, Petitioner accused them of drugging her. She reportedly called multiple times requesting her results and was increasingly agitated

8

with the Liam's Place workers. Her visits were suspended and she refused to return for drug testing.

The dispositional hearing was held on January 25, 2023, and February 17, 2023. During that hearing, the court heard testimony from the forensic psychologist, Dr. Meagen Green; the Liam's Place service provider, Stevie Edwards; CPS worker, Caitlin Henshey; and Petitioner. Dr. Green testified consistent with the report that Petitioner received a "poor" prognosis for improved parenting based on a substantial failure to participate with the evaluation and refusal to discuss the children at issue in the previous abuse and neglect proceedings, and minimization of the referral concerns. Dr. Green also took issue with Petitioner's history of substance abuse and "indications of poorly controlled mental health concerns," testifying that while "it would really require a little bit more time spent with someone who's trained in diagnostic assessment over time . . . [she] really thought [Petitioner] had some indications of bipolar disorder."

Ms. Edwards testified that Petitioner was compliant with services, doing well, and participating, but that for the weeks preceding the dispositional hearing it was difficult to provide them because Petitioner was paranoid after the positive drug screen result and believed the providers were "out to get her." She also testified that the visits with the child were going well until they were suspended after Petitioner's erratic behavior following the positive drug screen result. Finally, Ms. Edwards found that Petitioner had not acknowledged abuse and neglect from the prior cases.

9

Ms. Henshey testified similarly to Ms. Edwards as to Petitioner's belief that the providers were against her and detailed Petitioner's erratic behavior toward them. Petitioner questioned Ms. Henshey's position that her seven prior terminations and the two visitation violations were grounds for termination of parental rights based on DHS's failure to raise those issues previously, to which she responded that it was still the intent to try for reunification at the time. Ms. Henshey also testified about Petitioner's compliance with the improvement period:

> Q.     So we have got a positive drug screen, going to the foster home in January when she is not supposed to, and taking her child to the Regatta when she wasn't supposed to.
>
> Do I have three examples of non-compliance or was there another one that I am missing here?
>
> A.     Those are the three obvious examples of non-compliance, but just because she is participating in services does not mean she is making progress. She has not made any meaningful progress at all.
>
> Q.     Well, and I don't see that in any of the reports that she is not making progress. She is taking care of her child. The child is attached to her. She comes to -- I mean, we are worried about how she takes care of her child, right?
>
> A.     I am concerned about her mental health and how that will affect her ability to parent.
>
> Q.     Have we seen any evidence during any of these visitations that we have had that she is hallucinating or whatever and not taking care of her child during these supervised visits? Is there any evidence of that?
>
> A.     No. I believe she is able to maintain for two hours.
>
> Q.     Well, we haven't tried more time, have we?
>
> A.     We can't.

10

Q.     You can't? So because you think there may be a problem, we are not going to try?

Ms. Henshey's testimony reflects concern about Petitioner's mental health issues that arose after the positive drug screen, Petitioner's purportedly unfounded concerns about the child's health, and other behaviors explained in the psychological evaluation.  Finally, she testified that it was concerning to DHS that Petitioner failed to acknowledge the abuse and neglect in this case or the other cases and that she received a poor prognosis in the psychological evaluation.  The court questioned Ms. Henshey about the recommendations in the psychological evaluation that Petitioner receive at least weekly individual psychotherapy and a consultation for medication management of symptoms of mood disturbance, to which Ms. Henshey responded that the provider offered psychiatric services and referred Petitioner to WVU Behavioral Medicine and she had declined those services.

Petitioner testified on her own behalf, explaining that her concerns about the child's health issues were related to her knowledge that the child's first placement, with whom Petitioner was friendly, had failed the tuberculosis screening and, later, various visits were cancelled because the child was ill.  She testified that she had concerns and was trying to give workers information to try to help.  When the child changed placements, Petitioner alleges that visit after visit was cancelled because the child was sick and she wanted to have her tested.  Related to mental health treatment, Petitioner testified that she did not

11

refuse mental health treatment to see if she needed any type of medication and that she "did the recommendation of the counseling and therapy" when Ms. Edward advised her to do so and had been going weekly. She testified that the clinic that provided counseling also drug screened her and that after the positive result, she had not been back to see the physician there because she distrusted them from that point forward.

At the close of evidence, the State argued that because it was a prior termination case, "the burden really is on [Petitioner] to demonstrate to this Court that she has made improvement." Relying on the psychological report to demonstrate that the prognosis was poor for her to obtain minimally adequate parenting and concurring that the mental health issues suspected in that report were a concern, the State argued that Petitioner should have availed herself of services to address her mental health issues. Petitioner argued that she had done everything that was asked of her, and that the two visitation violations had never previously been raised as problematic. Finally, Petitioner argued that the psychological evaluation reporting a "poor prognosis" was a "cookie-cutter" recommendation that routinely comes back in these types of cases as having a poor prognosis and that the State was inappropriately using it as a weapon to terminate parental rights. The Guardian ad Litem argued that "based on the allegations and the prior terminations, in [his] opinion, this becomes an aggravated circumstances type of a matter which would need complete compliance which has not happened in this case." And, he continued, there was a "failure to rectify any mental health needs that were laid out in the psychological [evaluation]."

By dispositional order entered May 12, 2023, the circuit court found that "with regard to [Petitioner], this is an aggravated circumstances case, and she has the burden to demonstrate to the Court complete compliance with the services offered." With respect to services, the court found that she had been successful with some aspects of the case plan and participation in services, but that her erratic behavior with case workers and service providers was consistent with her mental health diagnosis. It further stated "[g]iven that this is a case involving prior termination of parental rights, the Court FOUND that [Petitioner] has not met her burden of proof."[6] Because she failed to recognize that she had issues that needed to be addressed while the services were offered, the court concluded that "[Petitioner's] mental health issues have not been addressed." Finally, it found that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected because she showed a lack of motivation to acknowledge, participate, or correct the circumstances that led to the filing of the petition and that the failure to acknowledge and treat her mental health issues threatened the health and welfare of the child. This appeal followed.

## II.     STANDARD OF REVIEW

This Court's review of dispositional orders in abuse and neglect proceedings employs a blended review:

> "When this Court reviews challenges to the findings and conclusions of the circuit court, a two-prong deferential

---

[6] Emphasis in original.

13

standard of review is applied. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard." Syl. [Pt. 1], *McCormick v. Allstate Ins. Co.*, 197 W. Va. 415, 475 S.E.2d 507 (1996).[7]

## III.  ANALYSIS

On appeal, Petitioner assigns error to the circuit court's conclusion that termination of rights was the appropriate disposition.  She argues that the disposition decision was based on her perceived unaddressed mental health issues that DHS had never indicated were an issue until it sought termination of parental rights, two isolated incidents of visitation violations of which DHS was aware and did not consider problematic until it sought termination of parental rights, and her prior terminations of which DHS was aware when it agreed initially to reunification and later agreed to her improvement period.  In short, Petitioner's argument is that the bases for termination of her parental rights caught her off guard, because throughout the case those bases had not been posed as issues in need of correction until such time as DHS decided it was opportune to make issues of them.

Examining the instances of noncompliance posed to the circuit court, three were identified: the positive drug screen, and the two instances where Petitioner violated visitation rules.[8]  Setting aside the positive drug screen, while the two visitation events

---

[7] Syl. Pt. 1, *In re S. W.*, 236 W. Va. 309, 779 S.E.2d 577 (2015).

[8] We acknowledge that the single positive drug screen was discussed at disposition, but the circuit court did not make any findings relative to that positive screen, even stating

occurred in January 2022 and June/July of 2022, the record exposes only that those issues were discussed by the MDT and Petitioner told her side of the story. The January 2022 occurrence was very early in the proceedings and was the only instance actually addressed by the circuit court, at which time it indicated to Petitioner that she needed to abide by the visitation rules. DHS continuously provided summaries and participated in status hearings where it reported that Petitioner was complying and that visits were going well. The issues were never posed as violations of a court order or seriously concerning instances of noncompliance until the October 12, 2022 court summary amended its recounting of those events to cast them as such because DHS had decided to pursue termination of parental rights.

That said, we turn to the mental health aspect of this case, which appears to be the primary reason for terminating Petitioner's parental rights. We first recognize that the amended petition contains no allegations relative to Petitioner's mental health, and Petitioner was not adjudicated for mental health issues affecting her ability to parent the child. But Petitioner's parental rights were terminated for failure to follow through with the family case plan, consistent with West Virginia Code § 49-4-604(d)(3), that from our review did indicate that Petitioner needed to seek mental health counseling. Petitioner

that this was not a drug case. Instead, the court treated the events surrounding the positive drug screen as indicative of a larger mental health issue, so we do the same here.

15

argues that it was a requirement in name only until DHS decided to enforce it at the eleventh hour.

The record from the beginning of the case reflects in a provider note that it was a goal and condition of the improvement period that Petitioner would seek psychiatric counseling for mental health issues, that a referral was provided, and that she had refused treatment. That note predated the order granting the improvement period, which only states that the improvement period was governed by terms set by the MDT with no mention of this condition. Even so, we assume that seeking psychiatric counseling remained a condition of the improvement period as set by the MDT. But despite this condition and Petitioner's documented refusal to seek counseling, not once did DHS or the Guardian ad Litem represent to the circuit court that Petitioner was falling short in her improvement period because she was refusing counseling. Rather, they returned to the circuit court again and again, reporting that she was in full compliance and doing well, and we see no references in the record that Petitioner was told, or that providers were observing, that she was not making progress during that time.

The family case plan filed in August of 2022 listed that termination of parental rights was sought on the basis of her seven prior terminations; critically, the portion of the family case plan relative to untreated or concerning mental health issues that might affect parenting is completely blank. Though the case plan recommends termination, it was at the August hearing where the DHS also indicated Petitioner was compliant with

16

her improvement period, recommended it continue, and did not object to the MDT increasing her visitations.

Petitioner's mental health treatment became an issue after receipt of the psychological evaluation on September 29, 2022. This coincides with DHS's about-face in seeking to move forward with disposition and to terminate Petitioner's parental rights on October 12, 2022. Indeed, the psychological evaluation and the failure to follow the recommendation set forth there was the bedrock of DHS's case to terminate parental rights with the motion citing Petitioner's "poor prognosis" and failure to seek the required treatment. And yet, the recommendations in the psychological evaluation were known to Petitioner for less than two weeks before they were held against her for failing to follow them. Due process concerns and fundamental fairness require that a parent have an adequate opportunity to address these types of allegations, especially in a proceeding that can result in the termination of parental rights.

It is unclear when, if ever, those recommendations were adopted by the MDT as a condition of her improvement period. The "indication" of a mental health issue detailed in the psychological evaluation was just that—an indication. Dr. Green testified that someone would need to evaluate Petitioner over a longer period of time to make a diagnosis, but the fact of her having a mental health diagnosis in need of correction through intensive therapy was presupposed and implemented as though Petitioner had known throughout the duration of the case that she needed to be attending "at least weekly

17

individual psychotherapy" in addition to medication management of her "mood disturbance" that had yet to be diagnosed. And, Petitioner testified that she *had* been attending therapy and had not refused to seek treatment.

Still, Petitioner's erratic behavior in the time period following continuation of the dispositional hearing did expose that DHS's concerns about Petitioner's mental health are not without merit. Likewise, despite that DHS agreed to only proceed on the domestic incident that occurred in December 2021, Petitioner's prior terminations are not irrelevant in rendering a dispositional decision, nor is it irrelevant that Petitioner had regained custody of the child mere months before the incident that gave rise to the underlying petition.

We would ordinarily defer to the findings of the circuit court when it is apparent that it has considered the evidence and found that DHS has provided clear and convincing evidence that termination of parental rights is the appropriate dispositional decision because there is no reasonable likelihood that the conditions can be corrected and that termination of parental rights is in the best interests of the child.[9] But deference is an unworkable perspective to take here where it is apparent that the circuit court has

---

[9] *See* Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

18

impermissibly shifted that burden of proof onto the adult respondent. It is incumbent upon this Court to ensure that due process is not frustrated.

Initially, we note that the circuit court made a finding of "aggravated circumstances" at the end of this case in the dispositional order.[10] DHS has a statutory obligation to provide services as a prerequisite to the termination of parental rights unless one of the subsections of West Virginia Code § 49-4-604(c)(7) applies to absolve it of that duty. Here, DHS provided services throughout the case, consistent with its concession at the filing of petition that this would not be treated as a "presumptive termination" case. But while this code provision would have relieved DHS of providing services, it did not seek that absolution until the end of the case and so has little practical effect on the proceedings.

Regardless, a court directive that DHS need not provide services to an adult respondent does not in any way alter or shift the burden of proof at the disposition phase

---

[10] We observe for the sake of clarity that while courts and parties often use "aggravated circumstances" as a blanket term for circumstances where DHS is not required to provide services as a prerequisite to termination of parental rights, a finding of "aggravated circumstances" refers to a specific set of factual circumstances under West Virginia Code § 49-4-604(c)(7)(A). Under that subpart, circuit courts may make appropriate findings that absolve DHS of making reasonable efforts to preserve the family (i.e., provide services) in certain situations that include "abandonment, torture, chronic abuse, and sexual abuse." In this case, the appropriate code provision is West Virginia Code § 49-4-604(c)(7)(C), providing for the same result—that DHS need not provide services as a prerequisite to termination of parental rights—but for the reason that the adult respondent has had prior involuntary terminations.

19

where DHS seeks termination of parental rights. Similarly, while the burden is on the *movant* when seeking an improvement period,[11] we have been presented with no authority supporting a heightened "complete" compliance requirement in the face of aggravating circumstances as suggested below.

This Court has stated in no uncertain terms that "[DHS] always has the burden of proof in an abuse and neglect case."[12] We have held that "[t]he standard of proof required to support a court order limiting or terminating parental rights to the custody of minor children is clear, cogent and convincing proof."[13] We have reiterated that termination of parental rights is the most restrictive alternative that "is authorized only '[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future, and when necessary for the welfare of the child.'"[14] And, it is clear that "[t]he *State* must produce clear and convincing evidence to support this finding before the court may sever the custodial rights of the natural parents."[15] This is so even in the context of an improvement period: "[e]ven when

---

[11] *See* W. Va. Code § 49-4-610(2)(B) (2015) (requiring adult respondent to demonstrate by clear and convincing evidence that he or she is likely to fully participate in the improvement period).

[12] *In re C.S.*, 247 W. Va. 212, 220, 875 S.E.2d 350, 358 (2022).

[13] Syl. Pt. 6, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973).

[14] *State v. C.N.S.*, 173 W. Va. 651, 656, 319 S.E.2d 775, 780 (1984) (quoting W. Va. Code § [49-4-604(c)(6)]).

[15] *Id.* (citations omitted) (emphasis added).

20

an improvement period is granted, the burden of proof in a child neglect or abuse case does

not shift from the [DHS] to the parent, guardian or custodian of the child. It remains upon

the [DHS] throughout the proceedings."[16]  Decisively, the burden of proof to terminate

parental rights demands clear and convincing evidence and that burden remains at all times

on the State.[17]

---

[16] Syl. Pt. 2, *In re S. C.*, 168 W. Va. 366, 284 S.E.2d 867 (1981).

[17] We acknowledge that Syllabus Point 2 of *In re George Glen B.*, 205 W. Va. 435, 518 S.E.2d 863 (1999) (*George I*) and the similarly worded Syllabus Point 5 of *In re George Glen B.*, 207 W. Va. 346, 532 S.E.2d 64 (2000) (*George II*) state that

> The presence of one of the factors outlined in W. Va. Code, 49–6–5b(a)(3) [1998] *merely lowers the threshold of evidence necessary for the termination of parental rights*. W. Va. Code, 49–6–5b(a)(3) [1998] does not mandate that a circuit court terminate parental rights merely upon the filing of a petition filed pursuant to the statute, and the Department of Health and Human Resources continues to bear the burden of proving that the subject child is abused or neglected pursuant to W. Va. Code, 49–6–2 [1996].

(emphasis added).

To the extent those syllabus points refer to a lowered burden of proof to terminate parental rights in the case of a prior involuntary termination, we note, first, that, contextually, *George I* involved the failure of DHS to file a petition in pursuit of termination of parental rights in circumstances involving a child born to a parent with prior involuntary terminations as required by what is now West Virginia Code § 49-4-605(a)(3). Importantly, neither is postured as an examination of a dispositional decision to terminate parental rights.  Because it was not at issue in *George I* or in *George II*, the statutory basis for a "lowered threshold" for termination is not readily apparent in either decision or the cited code provision.  It is further obscured by the remainder of the syllabus point articulating that the burden rests with the State to prove that a child is abused or neglected, which is, definitionally, not a dispositional decision.  The Court appeared to be clarifying at Syllabus Point 2 of *George II* that while there is an obligation to *file*, the State bears the burden and must still meet the requisite evidentiary standards.

21

From our review of the transcripts and the dispositional order on appeal it is apparent that the circuit court impermissibly shifted the burden of proof onto Petitioner. During the hearing, the circuit court made the conclusion that

> if the mental health issue had been addressed, there may have been a chance, but I am not convinced that it has and I am not convinced that there should be any further direction toward trying any type of reunification. I don't think there is evidence of the improvements that are necessary to demonstrate that in the best interests of this child these parental rights . . . should continue.

Stated differently, the "clear and convincing" proof on which the court based termination was that Petitioner had not presented "convincing" evidence that she had addressed her mental health issues and had not presented "convincing" evidence that there should be further direction toward reunification. The State argued at the dispositional hearing that "the burden really is on [Petitioner] to demonstrate to this Court that she has made improvement." The same burden shifting language pervades the dispositional order, with the finding that "this is an aggravated circumstances case, and she has the burden to demonstrate to the Court complete compliance with the services offered." It further

When interpreting *George II* and applying it to different subsections of West Virginia Code § 49-4-605(a), this Court has maintained that "[d]espite the serious nature of the situations listed in subpart (a)(3), this Court held that the [DHS] was not relieved of its burden of proof and the circuit court was not mandated to terminate a parent's rights." *In re C.S.*, 247 W. Va. at 221, 875 S.E.2d at 359. Though it is important to establish that clear and convincing evidence is the requisite standard of proof even in the context of prior terminations, we do not find that *George I* and *II* have any bearing on this case. Here, the filing of the petition was not solely based on a prior termination, the new petition was not based on the same grounds as the prior termination cases, and DHS explicitly agreed that it would be proceeding on the domestic incident in December 2021 and not any type of "presumptive termination" case, even assuming such a thing exists.

explicitly states, "[g]iven that this is a case involving prior termination of parental rights, the Court FOUND that [Petitioner] has not met her burden of proof."[18]

It is further apparent from the record that while there may have been grounds to support termination of Petitioner's parental rights, we are left with the conviction that had the burden been placed where it ought, and DHS held to the weight of that burden, the circuit court may have reached a different conclusion. We have held that

> "[w]here it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children adjudicated to be abused or neglected has been substantially disregarded or frustrated, the resulting order of disposition will be vacated and the case remanded for compliance with that process and entry of an appropriate dispositional order." Syl. Pt. 5, *In re Edward B.*, 210 W. Va. 621, 558 S.E.2d 620 (2001).[19]

Consistent with that holding, we vacate the dispositional order terminating Petitioner's parental rights. We remand for the circuit court to hold a new dispositional hearing at which the requirements of Petitioner to seek mental health treatment may be explored, additional evidence may be taken to clarify when and if she sought mental health

---

[18] Emphasis in original.

[19] Syl. Pt. 8, *In re K. S.*, 246 W. Va. 517, 874 S.E.2d 319 (2022).

23

treatment as directed, and her current mental health status may be taken into account in rendering a dispositional decision in light of all of the evidence.

## IV.    CONCLUSION

For the foregoing reasons, we vacate the May 12, 2023, dispositional order of the Circuit Court of Kanawha County and remand for further proceedings consistent with this Opinion.

Vacated and remanded.